Ray H. SCHULZ and Doris L. Schulz,
Appellants,

v.

COMMISSIONER OF INTERNAL REV-
ENUE, Appellee.

John W. SCHULZ and Lucille Schulz,
Appellants,

v.

COMMISSIONER OF INTERNAL REV-
ENUE, Appellee.

Melvin F. KLAGUES and Pauline
Klagues, Appellants,

v.

COMMISSIONER OF INTERNAL REV-
ENUE, Appellee.

COMMISSIONER OF INTERNAL REV-
ENUE, Petitioner,

v.

Stanley C. LANDEN and Victoria M.
Landen, Respondents.

No. 17160.

United States Court of Appeals
Ninth Circuit.

Aug. 28, 1961.

Arthur B. Willis, John E. Scheifly and Willis, MacCracken & Butler, Los Angeles, Cal., for petitioners.

Hugh J. Ritchie and John C. McCall, both of Los Angeles, Cal., for respondents.

Louis F. Oberdorfer, Asst. Atty. Gen.; Lee A. Jackson, Hary Baum and Douglas A. Kahn, Attorneys Dept. of Justice, Washington, D. C., for Commissioner of Internal Revenue.

Before BARNES, MERRILL, Circuit Judges, and CROCKER, District Judge.

CROCKER, District Judge.

Two questions arise on appeal from the Tax Court: (1.) Whether the amount paid to a retiring partner for his share of a partnership, above the tangible asset value of the partnership, represents good will or a covenant not to compete, and (2.) Whether income from the business for February, 1952 should be reported in a separate return for that month and included in the individual returns of the partners for 1952, or whether such amounts should be included in the partnership return for the fiscal year beginning February 1, 1952 and ending January 31, 1953, and hence included in the partner's returns for the year 1953. The Tax Court decided against the taxpayers on both issues, and its judgment is affirmed in that its findings on the facts are not clearly erroneous.

We summarize the findings of the Tax Court:

On November 1, 1946, Ray H. Schulz, John W. Schulz and Melvin F. Klagues (hereinafter called "continuing partners") and Stanley C. Landen (hereinafter called "Landen"), organized a partnership by oral agreement under the firm name of Schulz Tool and Manufacturing Company (hereinafter the business will be called "Schulz Tool").

In the years that followed, Schulz Tool grew successfully, changing back and forth from a corporate enterprise to a partnership, always under the ownership of the original four. Initially, Schulz Tool had two branches of manufacture and sale, "proprietary items" and "job machine work." The "proprietary items"—mostly airplane fuel valves—were designed and developed by Schulz Tool to meet the requirements of aircraft manufacturers. By contrast, "job machine work" consisted of custom machining parts on orders from manufacturers who provided the necessary blueprints and designs. As the "proprietary items" became more profitable the company devoted more of its plant and labor to these items and less to "job machine work."

By January, 1952, the business, now a partnership, was heavily committed to the proprietary item field. Landen disagreed with the "continuing partners" on the emphasis on proprietary items. He was concerned about the risk factors, the amount of capital investment required and the research and engineering problem involved in the development and manufacture of such items.

These disagreements culminated in an all day meeting of the partners late in January, 1952, during which Landen suggested that it might be better if he sold his interest in the partnership. The continuing partners concurred. It was orally agreed to purchase Landen's interest as of January 31, 1952, and to close the partnership's fiscal year on that date. No discussion was had of the price to be paid Landen. All agreed that a physical inventory should first be taken as of January 31, 1952.

Subsequent to that date Landen contributed no services to the partnership nor did he participate in management. The other partners agreed to pay him a salary for the month of February inasmuch as he had no other source of income. Otherwise, he was not to participate in partnership profits.

Prior to mid-February, 1952, Landen submitted an offer to sell his interests to the other partners for $111,000. This figure was based on his estimates of the values of the physical plant and inventory ($93,000) and a figure of $18,000 attributed by Landen to good will. He did not disclose the breakdown of these figures to the other partners.

A meeting was held by all the partners on February 29, 1952, at which Landen submitted his offer and first told the "continuing partners" of his allocation of $18,000 to good will. The "continuing partners" made a counter offer for an overall price of $105,000, later increased to $107,000. At this point a stalemate occurred. Someone then suggested that they split the difference and buy the interest for $109,000. The attorney for the "continuing partners", who was primarily a tax practitioner, indicated that the figure might be acceptable, but he first wished to confer with the "continuing partners". In private the attorney advised that payments for a covenant not to compete enjoyed the income tax advantage of being deductible over the life of the covenant, whereas payments for good will were in no way deductible. Landen, however, was apparently not told of these tax consequences nor was he told that an amount which he received as payment for a covenant not to compete would be taxed as ordinary income, but that amounts received for "good will" would receive capital gains treatment.

Being thus advised, the other partners agreed to the $109,000 compromise provided that $18,000 thereof would be designated as separate consideration for Landen's covenant not to compete, and that no amount would be designated as consideration for good will.

After some discussion, it was agreed that the "continuing partners" would pay Landen $18,000 for refraining for one

year from (a) hiring Schulz Tool's employees; (b) soliciting Schulz' active customer accounts; and (c) opening a machine shop within a radius of five miles from the then location of Schulz Tool's plant. Upon Landen's objection the five-mile limitation was reduced to one mile.

Prior to the aforementioned meeting no suggestion had ever been made to Landen that the "continuing partners" were interested in his covenant not to compete either for customers or for labor supply.

The February agreement was reduced to writing which specified January 31, 1952, as the date of dissolution. The written agreement stated the price of Landen's interest as $91,000. A separate covenant not to compete appeared in Article IV of the agreement and provided in part: "In consideration of the faithful observance of the covenant not to compete, the continuing partners agree to pay to the retiring partner the amount of Fifteen Hundred Dollars ($1500) for each month that the retiring partner refrains from competitive acts * * * until a total of Eighteen Thousand Dollars ($18,000) has been paid."

The partners also published and filed a notice of dissolution which specified January 31, 1952 as the date of dissolution.

Pursuant to Section 188 of the Internal Revenue Code of 1939, the continuing partners included the distributive shares of the new partnership (i. e. the same business, without Landen as a partner) for the fiscal year beginning February 1, 1952, and ending January 31, 1953, in their respective individual returns for the calendar year ending December 31, 1953.[1] Hence, the individual returns of the continuing partners for the calendar year 1953 reflected the deduction of the

amounts paid by the partnership for the alleged covenant. The Commissioner sent a deficiency notice disallowing this deduction.

In their petition for a redetermination of the deficiency filed in the Tax Court, the "continuing partners" objected to the disallowance of the deduction and also raised a new point. They contended that the old partnership—including Landen—was not, in fact, terminated on January 31, 1952, but rather on February 29, 1952. Hence, income earned by the partnership in the month of February 1952 should not be included in their individual returns for the year 1953, but rather in the individual returns for the year 1952 pursuant to Section 188, supra.

All of the returns in question were filed with the District Director in Los Angeles, California. This court has jurisdiction to review the decision of the Tax Court pursuant to Section 7482 of the Internal Revenue Code, 26 U.S.C.A. § 7482.

*Alleged covenant.* We think the Tax Court was correct in concluding from these facts that this purported covenant was in reality a sale of good will. We concur with that court in finding that the following factors indicate that there was a sale of good will: (a) the "continuing partners'" knowledge that Landen did not wish to compete in the production of "proprietary items"; (b) the "continuing partners'" knowledge that Landen did not have the engineering background nor sales contacts necessary to compete; (c) the fact that the covenant was for a period of only one year, a time during which, because of the Korean war priorities, it would be most unlikely that Landen would actually compete; (d) the fact that both parts of the covenant were of minimal time and area. Moreover, we are impressed by evidence indicating that the covenant was not even considered un-

[1] § 188. "Different taxable years of partner and partnership. If the taxable year of a partner is different from that of the partnership, the inclusions with respect to the net income of the partnership, in computing the net income of the partner

for his taxable year, shall be based upon the net income of the partnership for any taxable year of the partnership * * * ending within or with the taxable year of the partner." 26 U.S.C.A. § 188.

til late in the negotiations, apparently not until a bid of $107,000 had been made.

We also agree with the Tax Court that there were indications that Schulz Tool had built up considerable good will despite the relatively short time of operation. Schulz Tool had proved its ability to undersell competition because of expertise, know-how and efficiency. Its products had a favorable reception. It had proved its ability to develop basic designs. It enjoyed a high profit margin and high earnings per employee. The backlog of customer orders amounted to several millions of dollars.

None of the indices of good will were recognized in the values set by the parties to this purchase.

In reaching our conclusion, we do not mean to imply that the form which the parties use to effectuate their transaction should be given no consideration. Rather, we concur with the Tax Court's quotation from Ullman v. Commissioner, 2 Cir., 1959, 264 F.2d 305, 307, 308 that "when the parties to a transaction such as this one have specifically set out the covenants in the contract and have there given them an assigned value, strong proof must be adduced by them in order to overcome that declaration." However, we think that the covenant must have some independent basis in fact or some arguable relationship with business reality such that reasonable men, genuinely concerned with their economic future, might bargain for such an agreement.

Generally speaking, the countervailing tax considerations upon each taxpayer should tend to limit schemes or forms which have no basis in economic fact. The Comissioner should be slow in going beyond the values which the taxpayers state when such countervailing factors are present. Such a result gives certainty to the reasonable expectations of the parties and relieves the Commissioner of the impossible task of assigning fair values to good will and to covenants. Since amounts saved by one taxpayer are generally made up by the other, there is no appreciable loss of revenue. See 67 Yale Law Journal 1261.

Here, however, the countervailing forces do not appear. Landen was apparently unaware that the tax benefits which he was willing to confer upon the "continuing partners" would be a tax detriment to him.

In this court, the "continuing partners" strenuously urge that the covenant here had a business value in protecting the labor supply of Schulz Tool. They contend that employees who were valuable for the manufacture of "proprietary items" would also be valuable in "job Machine work" and that the short duration of the covenant does not argue against its validity since the possibility of Landen hiring away valued employees would wear away soon. Although granting the possibility of such protection having a business value, we think that this justification was not present in the "continuing partners'" minds at the time of execution.[2]

In reaching its decision, the Tax Court relied, in part, on the premise that "even if we assume that the covenant was important for the reasons alleged, it is clear that a pool of skilled labor and active customer accounts are contributory elements to good will and to the value of a going concern." In this sense, the Tax Court found that the covenant was "nonseverable" from the good will of Schulz Tool and "nonseverable" from the interest which Landen transferred. Being nonseverable, that Court found the covenant "is essential to assure the purchaser the beneficial enjoyment of the good will he has acquired."

However, as noted in Mertens' treatise on Law of Federal Income Taxation, volume 3B, Section 22.33, "It is difficult to understand as a matter of economic reality how * * * such a covenant can be anything except 'nonseverable' or 'ancillary' * * *." If there is a covenant which has a basis in economic

---

2. In this regard, it seems significant that the "other partners" have abandoned the customer lists as having business value, in their briefs.

reality, it *must* contribute to good will. The determination of whether or not the covenant is "severable" or "nonseverable" has no probative value in determining whether or not it should be considered as a surrender of income—and hence a covenant—or a component of the business which was sold—and hence part of the assets.

The difficulty may have arisen from confusion with a factual issue which *is* probative of the issue of whether or not there is a genuine covenant. If there is reason to believe that the business has prospered because of the character or the reputation of the proprietor or partner—the friendly bartender or the trusted stockbroker are examples—this would tend to show that a genuine business reason prompted the covenant. Such reputation or character would also form part of the good will. However, the question is one of fact and not one of classification as "severable" or "nonseverable".

█ The rules enunciated herein, namely, that in proper cases the commissioner can go beyond the formal dealings of the parties to see if these forms reflect meaningful substance—are elementary in the law of taxation and find support in the Supreme Court. See Commissioner of Internal Revenue v. Court Holding Co., 1945, 324 U.S. 331, 65 S.Ct. 707, 89 L.Ed. 981 and Gregory v. Helvering, 1935, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596, as well as in Ninth Circuit cases, Particelli v. Commissioner, 1954, 9 Cir., 212 F.2d 498 and Kirschenmann v. Westover, 1955, 9 Cir., 225 F.2d 69, certiorari denied 350 U.S. 834, 76 S.Ct. 70, 100 L.Ed. 744.

These rules are consistent with the recent Ninth Circuit case of Rogers v. U. S., 9 Cir., 290 F.2d 501 and with the case of Hamlin's Trust v. Commissioner, 10 Cir., 1954, 209 F.2d 761 which was cited in Rogers. Admittedly, both courts relied heavily on the formal means which the parties used. However, there it was the parties rather than the Commissioner who sought to vary the formal instruments. See Higgins v. Smith, 1940, 308 U.S. 473, 477, 60 S.Ct. 355, 84 L.Ed. 406.

Of course, it is clear that we do not agree with the dicta found in Hamlin's Trust case regarding the covenant as severable or nonseverable, 209 F.2d 761 at 765.

█ In summary, we agree with so much of the Tax Court's opinion as deals with the factual inquiry and the conclusions thereon. We do not think that the classification of the alleged covenant as severable or nonseverable is helpful in making this determination.

*Partnership Income for February 1952.* We agree with the Tax Court that the partnership between Landen and the "continuing partners" ceased as of January 31, 1952, in accordance with the declared intent of the partners and the evidence indicating that Landen subsequently did not participate in partnership profits nor in the management of the partnership. So finding, it is unnecessary to decide the interesting alternate grounds upon which the Tax Court relied.

The judgment of the Tax Court is affirmed.