James A. PATTERSON and Dorothy A. Patterson, Petitioners-Appellees,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellant.

No. 85–1904.

United States Court of Appeals, Sixth Circuit.

Argued Nov. 21, 1986.

Decided Feb. 2, 1987.

Glenn L. Archer, Jr., Asst. Atty. Gen., Tax Div., Dept. of Justice, Michael L. Paup

(Lead Counsel), Roger M. Olsen, Gary R. Allen, Elaine F. Ferris (argued), Fred T. Goldberg, Jr., Chief Counsel, I.R.S., Washington, D.C., for respondent-appellant.

L.L. Leatherman, Greenbaum, Doll & McDonald, Louisville, Ky., Hiram Ely, III (Lead Counsel), argued, for petitioners-appellees.

Michael S. Horne, Covington & Burling, Washington, D.C., for amicus curiae.

Before GUY, Circuit Judge; PECK, Senior Circuit Judge; and EDGAR, District Judge.*

RALPH B. GUY, Jr., Circuit Judge.

This case involves a dispute as to the amount, if any, of the consideration received for a sale of stock that is properly allocable to a covenant not to compete. The Tax Court held in favor of the taxpayer, Patterson, concluding that he had correctly allocated the entire sale price to the sale of stock. The Commissioner filed a timely appeal. For the reasons set forth below, the decision of the Tax Court is affirmed.

## I.

The facts of this case, some of which were stipulated, may be summarized as follows:

Taxpayer, Patterson, has a degree in marketing from the University of Louisville and has been in the food business since approximately 1959. For some time prior to 1975, the year here in question, he was the franchisee of several of a chain of coffee shops known as Jerry's Restaurants. This chain was owned by Jerrico, Inc. (Jerrico), a corporation based in Kentucky. In 1968, Patterson became favorably impressed with a fast-food business specializing in seafood which he had observed in Houston, Texas. Based on that experience, he met with Warren Rosenthal, president of Jerrico, to discuss joining with him in

forming a chain of fast-seafood restaurants. Rosenthal agreed to join in such an endeavor, provided that Jerrico would hold a controlling interest of 60 percent of the business. Ultimately, they agreed to structure the business as a corporate subsidiary of Jerrico, to be known as Long John Silver's, Inc. (LJS). Jerrico acquired 60 percent of the 2,000 shares issued for $24,000, while Patterson purchased the remaining 40 percent for a contribution of $16,000.

Taxpayer was thereafter instrumental in developing every aspect of the LJS enterprise. He was named president of LJS at its inception, managed the opening of new restaurants in the LJS chain, and participated in developing the recipe for the batter in which the seafood served in LJS restaurants was cooked. Taxpayer received an annual salary in the amount of $60,000–$65,000 for serving as the president of LJS. He also sat on the board of directors of Jerrico.

Although LJS experienced a slow rate of growth initially, by the early 1970's it had developed into a rapidly growing and highly profitable enterprise. By the end of its fiscal year ending June 30, 1975, LJS was operating 373 restaurants, and by October 10, 1975, it was operating 434 restaurants, with 88 more under construction. A report prepared by Burns, Pauli & Co.[1] in August of 1974 enthusiastically described LJS's financial history as a "dramatic success." The report further revealed that LJS's profit margin was higher than that of other well managed fastfood operations, such as McDonald's, and that, as of June 30, 1974, LJS was the primary money-maker for Jerrico, bringing in as much as 83% of the company's profits. By contrast, Jerrico's other two divisions, the coffee shop chain, and a group of seafood specialty restaurants, were returning only modest profits or were losing money. The report attributed LJS's high rate of success to a superi-

---

* Honorable R. Allan Edgar, United States District Court, Eastern District of Tennessee, sitting by designation.

1. Burns, Pauli & Co. was in the business of giving investment advice to such clients as mutual fund managers, institutional investors, and pension fund managers.

or product, a "seasoned restaurant management group," well-trained personnel, pleasant surroundings, and relatively short hours of operation.

LJS's high profits resulted in substantial appreciation in the share price of Jerrico's stock, and thus prompted a great deal of interest in the company among members of the Wall Street investment community. Sometime in 1974, however, taxpayer and Warren Rosenthal (who continued to serve as Jerrico's president) began to experience difficulties in their business relationship when Rosenthal perceived that taxpayer had invaded his own province by establishing direct communications with potential investors. At the same time, some investors who were interested in LJS expressed reservations to the management of Jerrico about the 40 percent minority interest which taxpayer held in LJS. Acting at the request of Rosenthal in mid–1974, Alan McDowell, who had served as an investment banker for Jerrico, examined the possibility of a buy-out of Patterson's interest in LJS with shares of Jerrico. McDowell's conclusion, copies of which were transmitted to Warren Rosenthal and to Patterson, was that Patterson should receive sufficient shares in Jerrico to provide him with a 30 percent interest in the company, or approximately 660,000 shares, an interest which would have been greater than Rosenthal's own interest in Jerrico at that time. Thinking that this was unreasonable, Rosenthal rejected McDowell's recommendation.

Matters apparently came to a head between taxpayer and Rosenthal in early 1975, when taxpayer refused to pledge his LJS stock or to execute a dividend waiver agreement with respect to that stock as security for a proposed line of credit or a loan in the amount of between $9,000,000 and $15,000,000 from Chemical Bank to Jerrico. Chemical declined to provide such financing unless taxpayer would pledge his stock or execute such a dividend waiver. In April, 1975, following taxpayer's refusal to execute the requested pledge and waiver agreement, the directors of LJS removed taxpayer as president of that corporation.

Taxpayer resigned from the board of directors of Jerrico in May, 1975. At about the same time, negotiations began for Jerrico's purchase of taxpayer's 40 percent interest in LJS.

It was found by the Tax Court, and is undisputed by the parties, that Jerrico's interests during the negotiations were threefold: first, to agree to a purchase price for the stock; second, to include a covenant not to compete; and third, to allocate a value to such covenant. Jerrico's primary reason for insisting on the covenant was to protect the value of the interest in LJS which it was receiving from Patterson.

Initially, Jerrico had in mind a total price of between $8,000,000 and $12,000,000, of which it expected that up to $3,000,000 would be for a covenant not to compete, and the remainder would be for Patterson's shares. The $3,000,000 figure for the non-competition covenant was derived by Rosenthal as an estimate of the damages Jerrico might sustain in the event that Patterson competed in the fast-seafood market after the sale of his interest in LJS.

Since he had no interest in competing with his former associates or in going into the fast-seafood business again, Patterson did not object to executing the noncompetition covenant, as long as it would allow him to become involved in other types of restaurant enterprises, and he regarded such covenant as having no value. As stated by Patterson at trial:

> Well, I didn't want to [compete] because [LJS] was my baby. I had conceived it, and given birth to it, and seen it rise to—to what was then the top seafood chain in the country. There was nothing I wanted to do to—harm it. . . .

As for the purchase price, in light of Alan McDowell's earlier estimates, Patterson believed that his stock in LJS was worth a fair market value at that time of 660,000 shares of Jerrico stock, or approximately $25,000,000—$30,000,000.

As the discussions continued, Jerrico offered to value the noncompetition covenant

expressly in the purchase agreement, first at $3,000,000, then at $2,000,000, and finally at $1,000,000. Jerrico's representatives were not willing to agree to allocate any specific amount less than $1,000,000 to the covenant, because they did not believe that the covenant was worth any less than that amount. Taxpayer, on the other hand, who was aware of the likely tax consequences of an agreed allocation to the covenant, and who assertedly believed that Jerrico was offering him too little for his stock, was unwilling to agree to an express allocation of any amount to the covenant. In early June, 1975, the parties reached an agreement in principle for Jerrico's purchase of taxpayer's stock in LJS and his execution of a covenant not to compete for a total consideration of $15,000,000 or, if greater, the proceeds of a public offering of 350,000 shares of Jerrico stock.

During the remainder of June, 1975, Jerrico's attorneys prepared a series of written drafts of the sales contract and covenant, which were then reviewed by Patterson's attorneys. Language which would have allocated a stated portion of the purchase price to the covenant, which appeared in an early draft of the covenant, was deleted by Patterson's counsel, and never reappeared in any subsequent draft. In each draft of the contract, language was retained by both parties providing that "[a]s consideration for part of the purchase price ... Patterson agrees, simultaneously with the execution of this Agreement, to enter into a Covenant Not To Compete in the form attached hereto as Exhibit F." The noncompetition covenant is an eight-page document wherein Patterson agreed, in essence, not to engage in the seafood business or induce anyone else to engage in such business for a period of three years, and not to induce or influence any employee of LJS or Jerrico to terminate such employment or to work for him for a period of one year. It was recited three times in succession in the "whereas" clauses of the covenant that it was being given "as an inducement to" or "in consideration of" the acquisition of Patterson's 40 percent interest in LJS.[2]

In accordance with the terms of the foregoing contract, on or about October 16, 1975, Jerrico paid Patterson the sum of $19,251,909, representing its proceeds from the sale of 350,000 shares of its common stock. On their joint federal income tax return for 1975, taxpayer and his wife treated the difference between the net amount received and his basis in his LJS shares as proceeds from the sale of stock, thus treating the entire amount as long-term capital gain. Jerrico, by contrast, allocated one million dollars of the total price to the covenant, and thereby sought to amortize that amount over the three-year term of the covenant.

## II.

On audit of Patterson's 1975 return, the Commissioner determined that one million dollars of the consideration received by him should be allocated to the covenant and, thus, claimed as ordinary income. In accordance with procedures followed in situations such as this, where the buyer and seller have sought to accord inconsistent tax treatment to a transaction, the Commissioner has also proposed to disallow Jerrico's treatment of one million dollars of the purchase price as allocable to the noncompetition covenant.[3]

2. WHEREAS the Selling Stockholder, as an inducement to cause Jerrico to execute the Agreement, promised to deliver to Jerrico and LJS an agreement by said Selling Stockholder not to compete with the business of LJS or to otherwise cause it damage or harm;

    WHEREAS, the Selling Stockholder is desirous of having Jerrico consummate the acquisition of his Forty Percent (40%) stock interest in LJS and, in order to induce Jerrico to consummate and close such acquisition, is willing to and hereby makes the covenants set forth herein.

    NOW, THEREFORE, in consideration of the agreements made by Jerrico in the Agreement and in consideration of the consummation of the acquisition of the Selling Stockholder's Forty Percent (40%) stock interest as therein contemplated by Jerrico, ...

App. at 85.

3. During the course of negotiations, Jerrico indicated that it may seek to have the amount

Patterson challenged the Commissioner's determination in his case by filing a petition for the redetermination of the deficiency in the Tax Court. Following the 1984 trial in this case, the Tax Court filed its memorandum opinion, concluding that taxpayer had correctly allocated the entire amount of consideration received under the terms of the contract to his LJS stock. The court viewed the failure to include an express allocation in the contract to the covenant as an indication of an agreement between the parties that no amount be so allocated. The court concluded that Jerrico had "acceded" during the course of negotiations to Patterson's view that no amount should be allocated to the covenant because Jerrico had attempted to include an express allocation and taxpayer had consistently refused to acquiesce.[4]

Further, the court explicitly rejected the Commissioner's contention that the allocation should be based on a determination of the respective economic values of the covenant and the stock. In refusing to make such an independent valuation, the court noted that this "would require us to rewrite the subject agreement so as to impose upon petitioner a contractual term which was the object as respondent concedes, of intense negotiations, but which

petitioner unequivocally and consistently refused to accept." (Mem. op. at 16). While acknowledging the language in the contract to the effect that Patterson's agreement to enter into the noncompetition covenant constituted "consideration for part of the purchase price," the court found that, viewing the record as a whole, the quoted language was included in the belief that it would provide a valid legal consideration for the noncompetition covenant.

Finally, in the most terse portion of the opinion (and that most vigorously contested by the Commissioner), the court noted that "[w]e are mindful that our foregoing holding suggests that the covenant was given for *some* value." (Mem. op. at 19). The court found that that value was clearly less than one million dollars, and then quoted a portion of an earlier Tax Court opinion in the case of *Major v. Commissioner*, 76 T.C. 239 (1981), suggesting that the covenant at issue in that case as well as this case possessed no more than an "unascertainable de minimus value." *Id.* at 251.

### III.

The only issue presented for our review is whether the Tax Court erred in conclud-

allocated to the covenant raised from one million to three million dollars. Thereafter, the Commissioner notified petitioner of his intent to increase the covenant's allocation correspondingly. The Commissioner explained that this was necessary to protect the IRS from a "whipsaw" position whereby taxpayer would be permitted capital gain treatment of the sale proceeds while Jerrico might establish entitlement to deduct the full three million it now claims the covenant was worth.

4. The Tax Court listed the following factors as supporting its finding of a mutual intent to make no allocation to the covenant:

First, the "whereas" clauses of the covenant provide in three separate paragraphs that the covenant was given in consideration of Jerrico's acquisition of petitioner's minority interest in LJS, suggesting that it was not in consideration of the payment of any sum of money. Second, Jerrico's obligation to pay the agreed amount to petitioner was not conditioned in any manner upon petitioner's compliance with the noncompete covenant, suggesting that no portion of such amount was allocable to the covenant. Third, the benefits

of the contract, presumably including petitioner's entitlement to receive the full purchase price, were to inure to the benefit of petitioner's heirs, personal representatives, successors and assigns, a provision which would seem to be inapposite to the extent that a portion of the purchase price was for *petitioner's* agreement not to compete with his former employer. Fourth, the contract provided for Jerrico's payment of interest on any notes it might have been required to make in petitioner's favor in the event that the sale of Jerrico's stock failed to occur in a timely manner. It seems improbable that Jerrico would pay interest on an obligation if it was incurred for a continuing covenant.

Lastly, we find it significant that Jerrico's prospectus for the October 1975 stock offering fails to list the noncompete covenant within its description of those "material factors" which were considered in fixing the purchase price stated in the contract.

Mem. Op. at 17–18 (footnotes omitted, emphasis in original).

ing that the taxpayer was entitled, on the basis of the contractual provisions in question, to treat the entire amount received on the sale of his LJS stock as consideration for the stock alone. Jurisdiction is conferred on this court pursuant to the provisions of § 7482 of the Internal Revenue Code of 1954. 26 U.S.C. § 7482.

The Commissioner argues that the court misconstrued the agreement as allocating zero to the covenant. He contends that the evidence before the court established that both parties agreed that the covenant had a value, but that their disagreement was as to the specific amount. Therefore, he asserts, the Tax Court erred as a matter of law in failing to consider the covenant's "independent economic significance" and to assign relative values to both the stock and the covenant.

Patterson essentially argues that the intent of the parties should be the controlling factor and that here, the lack of a specific allocation clearly evidences an intent that no value be assigned to the covenant. The fact that the parties were sophisticated business persons engaged in an arms-length transaction with the advice of capable counsel precludes, in taxpayer's view, subsequent "re-negotiation" of the contract by a court. Finally, he asserts that, since the evidence established that Jerrico did not actually pay anything extra for the covenant, it cannot now establish an amortizable basis for it.

## IV.

■ It is well settled that any consideration genuinely paid for a covenant not to compete forms the cost basis of a fixed-life, depreciable, intangible asset which yields an amortizable deduction to the buyer for the life of the covenant. Treas.Reg. § 1.167(a)–3. However, any amount paid for goodwill, since it does not waste, becomes a nonamortizable capital asset.

Goodwill is effectively acquired by a buyer in any case where the terms of the transfer allow the purchaser to "step into the shoes of the seller" with respect to continued patronage, supplier access, and business contacts. *Winn-Dixie Montgomery, Inc. v. United States*, 444 F.2d 677, 681 (5th Cir.1971).

■ On the other hand, amounts received by a seller for a non-competition covenant are considered to be given as compensation for lost earnings and, as such, are taxable as ordinary income. Conversely, amounts received by a seller for the goodwill or going concern value of the business are taxed at the more favorable capital gains rates. Generally, depending upon the allocation made, amounts saved by one taxpayer are made up by the other, thereby causing no appreciable loss of revenue. *See*, Note, *Tax Treatment of Covenants Not to Compete: A Problem of Purchase Price Allocation*, 67 Yale L.J. 1261, 1269–70 (1958). Therefore, the Commissioner is mainly interested in having the transaction reported consistently by both parties in order to avoid being "whip-sawed" by two alternative versions which yield the least tax revenues from both taxpayers.[5] In this case, the Commissioner requested an indefinite continuance for the purpose of joining Jerrico, with whom he is currently involved in settlement negotiations. Despite denial of this motion by the Tax Court, Jerrico was permitted to submit an amicus brief before this court and it is clear that our determination with respect to petitioner Patterson will necessarily mandate Jerrico's tax treatment of the covenant as well.

■ In cases involving allocations to covenants not to compete, the respective petitioners each bear the burden of proving that the Commissioner's determination as to them is erroneous. *Welch v. Helvering*,

---

**5.** Although technically occupying the position of stakeholder, the IRS normally will eventually side with either the buyer or the seller. In this case, the Commissioner has sided with Jerrico in arguing for some allocation despite the absence of any specific allocation in the agree-

ment, contrary to the position adopted in several similar cases. *See, e.g., Better Beverages, Inc. v. U.S.*, 619 F.2d 424, 426 (5th Cir.1980); *Petersen Machine Tool, Inc. v. Commissioner*, 79 T.C. 72, 81 (1982); *Major v. Commissioner*, 76 T.C. 239, 246 (1981).

290 U.S. 111, 54 S.Ct. 8, 78 L.Ed. 212 (1933). Further, our review of the factual inferences and determinations made by the Tax Court is confined to the clearly erroneous standard of Fed.R.Civ.P. 52(a), giving due deference of the trial judge's assessment of the credibility of the witnesses. *C.I.R. v. Duberstein*, 363 U.S. 278, 291, 80 S.Ct. 1190, 1199, 4 L.Ed.2d 1218 (1960).

## V.

The Commissioner argues for an interpretation of the contract which would find that the parties *mutually agreed* that the covenant had some value but were simply unable to settle upon a figure. On this basis, he contends that this case must be remanded for a determination of the proper value to be assigned to the covenant. In essence, he argues for an approach to this problem which would have the court focus on the "economic reality," or "substance over form," test, wherein the allocation or lack thereof by the parties is irrelevant to his ability to challenge an agreement as a sham transaction.

■ We of course acknowledge the Commissioner's ability, and indeed his duty, to look beyond the form of a transaction to its economic substance when there is reason to suspect either collusion or overreaching between the parties in order to improperly avoid the tax consequences of their actions. *Commissioner v. Court Holding Co.*, 324 U.S. 331, 65 S.Ct. 707, 89 L.Ed. 981 (1945). However, we also observe that cases involving covenants such as the one at issue here usually involve relatively sophisticated, self-interested parties who are simply attempting to allocate the tax burdens of their business deals between them:

> Generally speaking the countervailing tax considerations upon each taxpayer should tend to limit schemes or forms which have no basis in economic fact. The Commissioner should be slow in going beyond the values which the taxpayers state when such countervailing factors are present. Such a result gives certainty to the reasonable expectations of the parties and relieves the Commis-

sioner of the impossible task of assigning fair values to good will and to covenants. *Schulz v. Commissioner*, 294 F.2d 52, 55 (9th Cir.1961).

The problem faced by the courts in covenant not to compete cases was aptly explained in *Lazisky v. Commissioner*, 72 T.C. 495, 500 (1979):

> Pulled in opposite directions by two powerful axioms of law, (1) that a person should be free to contract and that, once made, contracts should be enforced as made (absent certain enumerated exceptions), and (2) that in the tax law, substance must prevail over form, the courts have tended to base their decisions on theories incorporating elements of both these principles.

In balancing these competing principles, the courts have emphasized one or the other of them according to the facts of the case. In those cases where the parties have clearly and unequivocally allocated a part of the total price to the covenant, courts, at the Commissioner's urging, have generally refused to allow a party to subsequently challenge that allocation without a showing of either "strong proof" that the contract as written did not conform to the intent of the parties (*Major v. Commissioner*, 76 T.C. 239, 247 (1981)), or the presence of mistake, undue influence, fraud, or duress (*Commissioner v. Danielson*, 378 F.2d 771, 775 (3d Cir.), *cert. denied*, 389 U.S. 858, 88 S.Ct. 94, 19 L.Ed.2d 123 (1967)). This approach favors the freedom/enforceability of contract principle on the justifiable assumption that the danger of sham transactions in this setting is minimal.

However, in those cases where no contractual allocation is made, but one party attempts later on to unilaterally make such allocation, the courts tend first to attempt to ascertain whether any *mutual intent* existed between the parties at the time of contracting as to the existence or lack of value attributable to the covenant. In making this inquiry, the courts look to the language of the contract itself as well as the negotiations leading up to its forma-

tion. *See, e.g., Peterson Machine Tool, Inc. v. Commissioner,* 79 T.C. 72 (1982) (language that covenant was "materially significant and essential to the closing" and that the covenants constituted a "material portion of the purchase price set forth hereinabove" clear indication that both parties intended *some* allocation); *Major v. Commissioner,* 76 T.C. 239 (1981) (language stating that "the sale price of *said shares of stock* is $800,000" held to support finding of mutual intent to make no allocation to the covenant); *Lazisky v. Commissioner,* 72 T.C. 495 (1979) (fact that parties were represented by experienced counsel, possible allocation was never discussed during negotiations, and contract language stated that purchase price was for "name, business, and goodwill," all lead to conclusion of mutual intent to allocate nothing to covenant).

Faced with cases wherein no specific allocation is made, *mutual intent* is often difficult to determine. Hence, the courts will often expand their inquiry by looking into the substance of the parties' bargain. The Seventh Circuit established substance as the paramount concern in *Wilson Athletic Goods Mfg. Co., Inc. v. Commissioner,* 222 F.2d 355 (7th Cir.1955). Petitioner had negotiated the buy-out of a small shoe manufacturer. While specific amounts were allocated to both current assets and equipment, the remaining amount was unallocated. In upholding petitioner's subsequent unilateral allocation to the covenant, the court relied on testimony by Wilson's president that the covenant was essential to the deal and that the seller's goodwill was of minimal value since its shoes would be sold under the Wilson name. The court stated that "[i]n view of the silence of the contract in this respect, it became necessary to determine then from the other evidence whether the covenant had a value, and if so the amount thereof." *Id.* at 357.

The Ninth Circuit has set forth the so-called "economic reality" test in *Schulz v.*

*Commissioner,* 294 F.2d 52 (9th Cir.1961). That case involved the purchase of a partner's interest by the co-partners. While the continuing partners were aware of the favorable tax consequences of an allocation to a noncompetition covenant, the withdrawing partner was not. In mid-negotiation, the sum of $18,000, which had previously been allocated to goodwill, was reallocated to the covenant. In holding that the seller had succeeded in adducing "strong proof" of a lack of mutual intent, the court stated their view that "the covenant must have some independent basis in fact or some arguable relationship with business reality such that reasonable men, genuinely concerned with their economic future, might bargain for such an agreement." *Id.* at 55.

In the case at bar, both parties were sophisticated, knowledgeable business persons who were represented by competent counsel. Under these circumstances, the likelihood of a collusive or sham transaction is remote; therefore it is not inappropriate to give effect to the parties' mutual intent with respect to valuation of the covenant, absent a clear indication that such allocation is totally contrary to economic reality.

Therefore, in cases where such parties have failed to allocate a specific amount of the purchase price to a noncompetition covenant, we find it proper to first attempt to discern evidence of mutual intent with respect to the covenant's value. In making this inquiry, the language of the contract itself as well as the circumstances surrounding its negotiation should be canvassed.[6] If a mutual agreement as to *some* value is ascertained, the court should then proceed to assess the covenant's independent economic significance in attributing a reasonable value to the covenant. If, however, such mutual intent is not found, the taxpayer seeking the allocation must prove what amount he was actually required to pay to obtain the covenant. *Bet-*

**6.** In this regard, the fact that the agreement contains no specific allocation may be considered "good evidence" of an agreement that the covenant possessed no value. *Theophelis v. United States,* 751 F.2d 165, 168 (6th Cir.1984).

*ter Beverages, Inc. v. United States,* 619 F.2d 424, 428 (5th Cir.1980). We agree with the reasoning of the Fifth Circuit in *Better Beverages* that the ultimate inquiry is "what, if any, portion of the lump sum price actually was exchanged for the covenant," without regard for what the buyer would have been willing to pay for the item. Id. at 431.[7] As this court observed in *Theophelis,* "if a contract contains a covenant not to compete, but nothing has been paid for it, there is nothing to deduct." 751 F.2d at 167.

■ We find this test appropriate in the instant case despite the fact that the buyer, Jerrico, is not technically a party herein. As we have explained, a determination as to the proper tax treatment accorded to Patterson necessarily determines the tax consequences to Jerrico as well. Jerrico has submitted an amicus brief in support of their position, and the Commissioner, as stakeholder, has ably argued its position in agreement with the buyer. Therefore, it remains only to apply the foregoing analysis to the facts of the case at bar.

## VI.

■ Initially, we reject the Commissioner's argument that the *Danielson* rule (requiring proof of fraud or undue influence to avoid a specific allocation), as adopted by this circuit in *Schatten v. United States,* 746 F.2d 319 (6th Cir.1984), controls the disposition of this case. The *Danielson* rule can only be meaningfully applied in those cases where a specific amount has been mutually allocated to the covenant as

expressed in the contract. However, in this case, the parties are not seeking to *vary* the terms of the contract but to have the court *construe* terms which are obviously ambiguous. *Cf. Peterson Machine Tool, Inc. v. Commissioner,* 79 T.C. 72, 82 (1982). Patterson focuses on the language contained in the covenant stating "whereas the selling stockholder is desirous of having Jerrico consummate the acquisition of his forty percent stock interest in LJS and, in order to induce Jerrico to consummate and close such acquisition, is willing to and hereby makes the covenants set forth herein" as support for his contention that the sole consideration received for the covenant was Jerrico's consummation of the stock purchase. Conversely, Jerrico focuses on the contract language which states that the covenant was given "[a]s consideration for part of the purchase price" in arguing for an allocation of one million dollars to the covenant.

The testimony given by the parties' attorneys who were involved in the negotiations clearly indicates an unresolved conflict regarding the covenant, based on both parties' awareness of the resultant tax consequences. In sum, we find that this testimony, as well as the conflicting language contained in the agreement, clearly establishes that the parties agreed only to disagree. Therefore, this case is likewise not controlled by our decision in *Theophelis v. United States,* 751 F.2d 165 (6th Cir.1984). In that case, we noted that the parties had never even discussed a possible allocation to the noncompetition covenant until their final meeting and that, at that time, they

---

7. In so holding, the court succinctly stated the difficulty of independently valuing a noncompetition covenant:

   [U]nlike the simple transfer of ownership in a conventional sale, the interest relinquished by the seller in executing a covenant not to compete is not parallel to that sought or received by the buyer. The value of such covenant to a purchaser, like Better Beverages, derives from the projected degree of increased profitability and likelihood of survival of its new enterprise attributable to the insulation of that enterprise, afforded by the covenant, from the deleterious competitive force that the seller could present. Value to the seller, on the

   other hand, is the measure of his foregoing the opportunity to re-enter a particular market for a given period. Consequently, because they are functions of totally independent sets of considerations, the respective values of the covenant to the buyer and seller are simply unrelated. For example, while a buyer may place great significance on the covenant as a protective device, a seller, who either does not desire to re-enter the market or who is independently foreclosed from re-entry, may place virtually no value on the same covenant. *Better Beverages,* 619 F.2d at 429 (footnote omitted).

essentially agreed *not* to allocate any part of the purchase price to the covenant.

▮▮▮▮ We are cognizant of the fact that in most cases where the court refuses to uphold an attempted allocation, an important factor in that decision is the lack of any bargaining over such allocation during the negotiations. *See, e.g., Lazisky,* 72 T.C. at 503; *Theophelis,* 751 F.2d at 167; *Schulz,* 294 F.2d at 54–55. However, although it is obvious that the covenant was an essential part of the agreement between the parties in this case and was bargained over right from the start, we find that the contradictory language contained in the agreement as well as the circumstances surrounding the protracted negotiations are a good indication that no mutual agreement was ever reached. Therefore, the Tax Court's finding that Jerrico "acceded" in Patterson's position that the covenant was without value was clearly erroneous. However, we affirm the court's judgment on the grounds that Patterson received, and, conversely, Jerrico paid, nothing for the covenant. Since the covenant therefore possessed a zero basis, Jerrico is entitled to no amortization deduction and Patterson realized no ordinary income as a result of the inclusion of the covenant in the contract of sale.

In reaching this conclusion, we considered the testimony presented at trial to the effect that:

(1) Jerrico's own investment banker, Alan M. McDowell, valued Patterson's interest in LJS at the equivalent of 660,000 shares of Jerrico; Patterson actually received the proceeds of only 350,000 shares. By McDowell's evaluation, Patterson's interest was worth in excess of $35 million.

(2) Jack Harris, Patterson's expert witness, who was intimately familiar with Jerrico and LJS through his work as a research analyst specializing in the evaluation of restaurant companies and through his work on a 1972 prospectus and stock offering for Jerrico, expressed his opinion that, at the time of the sale, Patterson's LJS stock was worth between $30 million and $45 million.

(3) After the details of the contract were announced, Jerrico's stock price increased substantially, indicating the stock market's opinion that Patterson had been grossly underpaid. The market price initially rose sufficiently to indicate the stock market's belief that Jerrico had received a benefit of $45 to $48 million for its $19 million purchase. Even at the time of Jerrico's market offering of 550,000 new shares, with its tremendously diluting effect, the market price of Jerrico still indicated that Jerrico's shareholders had received a benefit in excess of $30 million from its $19 million purchase.

(4) The Commissioner's own witness, Charles Haywood, a Jerrico board member, valued Patterson's interest as at least $15 million based on its "book value" alone, even though the real value of LJS was in the market's evaluation of its growth potential, not the depreciated value of its building and equipment.

(5) The sale contract also required Patterson to sell his ownership interest in four LJS franchise stores at book value, while the other LJS employee/owners of those same stores (Patterson's "partners" in those stores) were bought out according to a multiple of the stores' earnings. Patterson received only about $25,000 for his interest in these stores; but if he had been bought out according to the same formula as were his partners, he would have received approximately $250,000.

▮▮▮▮ We also note that this case is unique in that it involves the buy-out of a minority interest by the single majority shareholder. Although Jerrico attempts to discount this factor in its brief, it is clear that Patterson's only real potential buyer was Jerrico, the majority shareholder. As such, Jerrico was clearly in a superior bargaining position, as evidenced by the favorable price which it paid for Patterson's LJS stock. In order to establish its entitlement to the amortization it has claimed, Jerrico must prove a basis from which this deduc-

tion is to be calculated. The "economic reality" here indicates that Jerrico, knowing it was obtaining Patterson's minority interest at a bargain rate, did not, in fact, pay any consideration for the noncompetition covenant.[8] As the Fifth Circuit has pointed out:

> A taxpayer's failure of proof on this point may not be overcome by abstract arguments, not tethered to the fact of the transaction, as to what *might* have been a fair and equitable price or apportionment. It is not the task of this or any court to restructure a taxpayer's dealings, in lieu of his facing a prescribed burden of proof, in order to justify his entitlement to some tax benefit.

*Better Beverages*, 619 F.2d at 430.

The Commissioner and Jerrico argue that, since he was only a minority shareholder, Patterson technically never "owned" LJS's goodwill and therefore could not have transferred it by his sale of stock. However, realistically, Patterson's dominant presence in the operations of LJS from its inception and his role in its rise to profitability are clearly aspects of the business which were transferred to Jerrico via the stock sale. As the Ninth Circuit noted in *Schulz*, "[i]f there is reason to believe that the business has prospered because of the character or the reputation of the proprietor or partner ... this would tend to show that a genuine business reason prompted the covenant. Such reputation or character would also form part of the goodwill." 294 F.2d at 56. Therefore, although Patterson's covenant not to compete with Jerrico obviously was of some theoretical, potential value, Jerrico has failed to establish a cost basis in the covenant. We find the Tax Court's decision that the entire purchase price was payment for only Patterson's stock and accompanying goodwill was supported by the evidence, and its decision is AFFIRMED.

---

**8.** When the value of the interest transferred exceeds the purchase price, the Tax Court has ruled that there is no "room" for an allocation. *See, e.g., Valley Broadcasting Co. v. Commission-er*, 33 T.C.M. (CCH) 1099 (1974); *Howard Construction, Inc. v. Commissioner*, 43 T.C. 343 (1964).