**In re the Marriage of Ricky Warren SWEERE, Petitioner, Respondent,**

v.

**Ann Carter GILBERT–SWEERE, Appellant.**

**No. C6–94–2443.**

Court of Appeals of Minnesota.

July 18, 1995.

Gregory J. Schmidt, St. Paul, for respondent.

Diane Marie Dube, Minneapolis, for appellant.

Considered and decided by LANSING, P.J., and SCHUMACHER and PETERSON, JJ.

## OPINION

PETERSON, Judge.

Appellant Ann Gilbert argues the district court erred in finding that the gross proceeds from the sale of the parties' marital stock in a closely-held corporation did not

include $200,000 designated as payment for a noncompetition agreement signed by respondent Ricky Sweere. We agree and reverse and remand for further proceedings.

## FACTS

Appellant Ann Gilbert and respondent Ricky Sweere dissolved their marriage in 1992 pursuant to a stipulation. At the time of the dissolution, respondent was executive vice president of Pierce Companies, Inc. (PCI), a closely-held corporation. The parties owned 1,728.5 shares of PCI stock, 25% of the company's outstanding shares.

The dissolution decree awarded respondent the PCI stock and required him to pay appellant $450,000 within two months of the date of the judgment. The decree also awarded appellant maintenance for nine years and provided that maintenance would not be modified over the nine-year term and the court's jurisdiction over maintenance would end after nine years if respondent timely made the $450,000 payment. If the $450,000 payment were not timely made, all financial provisions of the decree including property division, maintenance, and support would be vacated.

Conclusion of law number eight in the decree further provided:

In the event [respondent] sells all of his interest in Pierce Companies, Inc. within eighteen (18) months of the date of the Judgment and Decree, then, in that event, [appellant] will share in the proceeds under the following formula: From the gross sales price of the stock shall be subtracted all transaction and selling costs related to the transfer of the stock, specifically including but not limited to, such items as income tax, brokers' fees, legal fees, escrow agent fees, document preparation costs, litigation costs, or any other reasonably incurred costs associated with converting the stock interest to cash, to arrive at a net figure from which shall then be subtracted $450,000.00, which shall be paid to [respondent], and the balance to be divided equally between the parties.

Within two months of the date of judgment, respondent resigned as vice president of PCI and sold the stock back to the company. For purposes of the stock repurchase, Piper Jaffray Inc., an investment firm, determined that PCI was worth $6,200,000 assuming that respondent signed a noncompetition agreement when he left the company.

In article five of the stock repurchase agreement, respondent agreed not to divulge or use PCI's trade secrets, keep any of PCI's tangible property, solicit PCI's customers for one year, solicit PCI's employees for one year, or compete with PCI for three years. The agreement provided:

In consideration of [respondent's] covenants in this Article 5, and in connection with [PCI's] purchase of all of [respondent's] shares of stock in [PCI], [PCI] agrees to pay to [respondent], at the Closing, the sum of Two Hundred Thousand Dollars ($200,000) (the "Noncompetition Payment").

The stock repurchase agreement stated that the sale price for the stock was $1,350,000. PCI paid respondent $1 million at closing and delivered a promissory note for the remaining $550,000 due for the stock and the noncompetition agreement. Respondent became president of another company that does not compete with PCI.

Appellant sought an accounting of the sale and an order requiring respondent to treat the entire $1,550,000 payment from PCI as the gross sales price of the stock to be divided according to conclusion of law number eight. The district court found that respondent

was paid $1,350,000.00 for his stock in the Pierce Companies, and that [respondent] was paid the sum of $200,000.00 as a result of a noncompetition clause which prohibits [respondent] from competing with the Pierce Companies for a period of three years. * * * Having extensively reviewed the arguments of the parties, the Court finds that the $200,000.00 payment for the noncompete clause is not subject to division pursuant to Conclusion of Law No. 8 of the Decree. The Court finds the opinion set forth in *Lowe v. Lowe*, 372 N.W.2d 65 (Minn.App.1985) to be persuasive in this regard.

The court denied appellant's request for an accounting of the sale on grounds that the stock's sale price had been set by the actual sale.

## ISSUE

Did the district court err in finding the $200,000 payment for the noncompete clause was not divisible under the terms of the dissolution decree?

## ANALYSIS

While this court need not defer to a trial court's legal conclusion about the marital or nonmarital nature of property, it must affirm the findings of fact supporting that conclusion unless they are clearly erroneous.

*Freking v. Freking,* 479 N.W.2d 736, 739 (Minn.App.1992). This court will not reverse a district court's valuation of an asset unless the valuation is clearly erroneous. *Hertz v. Hertz,* 304 Minn. 144, 145, 229 N.W.2d 42, 44 (1975).

▊ After a dissolution judgment has been entered and the time for appeal has expired, the district court may not modify a property division except in certain limited circumstances. Minn.Stat. § 518.64, subd. 2(d) (1994). However, a district court may issue an order implementing or enforcing a provision of the decree. *Erickson v. Erickson,* 452 N.W.2d 253, 255 (Minn.App.1990).

Appellant argues the district court erred in excluding the $200,000 identified as the noncompetition payment from the gross sales price of the stock. Appellant claims the purpose of the noncompetition agreement was not to compensate respondent for a loss of future earnings but to secure the transfer of the business goodwill and intangible property to the buyer. The business goodwill and intangible property have always been PCI's property, appellant argues, and are an integral part of the value of PCI stock. Because the PCI stock is a marital asset and the noncompetition payment was made incident to the stock sale to secure transfer of PCI's goodwill and intangible property, appellant concludes, the payment should be included in the gross sales price of the stock and must

be divided according to the terms of the decree.

Appellant's claim is not simply that the district court erred in determining the value of the PCI stock. Rather, her claim is that by accepting respondent's characterization of the noncompetition agreement without examining the actual nature of the agreement, the district court incorrectly determined that a portion of the value of the PCI stock is not marital property.

▊ In a dissolution action, the district court generally may consider intangible assets, including goodwill, to value marital property. *Nardini v. Nardini,* 414 N.W.2d 184, 190 (Minn.1987). While a spouse generally has ownership rights in property acquired during the marriage, a spouse ordinarily has no right to property acquired by the other spouse after the dissolution. Minn. Stat. § 518.54, subd. 5 (1994). When it is necessary in a marital dissolution to value a business acquired during the marriage,

[t]he property acquired during marriage should be limited to that portion of the value of [the business] that is not dependent upon [a spouse's] continued services.

*Rogers v. Rogers,* 296 N.W.2d 849, 853 (Minn. 1980). It therefore is improper to value a marital asset using any method that gives one spouse a forced share of the other spouse's income from postmarital employment. *See id.* (valuing business by taking present value of husband's earnings over next 11 years without excluding reasonable yearly compensation for him improper because it gave wife forced share of husband's postmarital income).

▊ But the fact that a business valuation assumes that a spouse will provide a noncompetition agreement does not, by itself, establish that the valuation method denies or restricts that spouse's future employment options. When a noncompetition agreement is signed in connection with the sale of a marital asset, one purpose of the agreement can be to cause the seller

to refrain from interfering with the transfer of marital goodwill. If the seller continues to practice or trade in the same locale, his clientele would not be trans-

ferred to the buyer. The seller would retain the very goodwill he is purporting to sell to the buyer. Under the covenant, the seller is free to practice elsewhere and to fully realize the value of his postseparation *labor*. The true economic subject of the covenant not to compete is the marital goodwill, not the husband's postmarital labor.

2 *Valuation & Distribution of Marital Property*, § 25.05[1] (1995) (emphasis in original); *see also Forward Communications Corp. v. United States*, 608 F.2d 485, 489, 221 Ct.Cl. 582 (1979) (seller's promise not to compete often merely protective device to ensure conveyance of goodwill).

A covenant not to compete can, however, also be a promise by one spouse not to perform services in the future. 2 *Valuation & Distribution of Marital Property, supra*, § 25.05[1]. In *Lowe v. Lowe*, 372 N.W.2d 65, 67 (Minn.App.1985) this court affirmed the trial court's rejection of a husband's valuation of his wife's business because the valuation was based on an assumption that the wife would sign a noncompetition agreement that would have substantially deprived her of her livelihood. It is important to note, however, that in *Lowe* this court stated:

> Although [husband's] appraiser subtracted [wife's] salary before capitalizing earnings, the trial court concluded that the rationale of *Rogers*, that one spouse should not get a forced share of the other spouse's future work, could logically be extended so that one spouse should not benefit from a valuation method that denies or restricts the other spouse's future employment options. [Husband's] valuation had that effect. The value was based, in part, on an assumed sale where [wife] would be required to sign a noncompete agreement. [Wife] is licensed in Minnesota, has the majority of her clients in the metropolitan area, and has built her reputation here. The sale of her business with a non-compete agreement would substantially deprive her of her livelihood.

*Id.* at 66–67.

In *Lowe*, the fact that the assumed sale required the wife to sign a noncompete agreement was not, by itself, determinative.

Instead, the court considered the effect the noncompete agreement would have on the wife's future employment opportunities. It was because the noncompete agreement restricted the wife's ability to perform personal services and, in effect, capitalized the wife herself that the valuation method was found to be improper.

The noncompetition agreement signed by respondent is significantly different from the agreement considered in *Lowe*. Respondent's agreement provided that $200,000 was payment for all five promises made by respondent in article five. In article five, respondent promised not to divulge or use PCI's trade secrets, keep any of PCI's tangible property, solicit PCI's customers for one year, solicit PCI's employees for one year, or compete with PCI for three years.

Four of the five promises in article five prohibited respondent from using PCI's assets while only one of the promises restricted the future use of his personal services. Assets acquired by the corporation during the marriage are corporate assets and their value should be reflected in the value of the stock. By agreeing not to use PCI's assets after he left the company, respondent secured the transfer of corporate assets to the buyer. When the district court found that the entire $200,000 payment was compensation for respondent's promise not to compete, it implicitly found that the other four promises were worthless. Nothing in the record supports the conclusion that securing the transfer of these assets was worth nothing.

Nor does the record support a conclusion that respondent lost postmarital income and employment opportunities due to his promise not to compete. Respondent said he turned down employment offers from PCI's competitors, but he introduced no evidence corroborating these offers or showing that the noncompetition agreement prompted his decision to reject the offers. Further, other evidence showed respondent had obtained his current job before he signed the noncompetition agreement and had no intention of competing with PCI. Finally, respondent said a portion of the stock sale proceeds was allocated to the noncompete agreement solely for tax reasons.

The rationale of *Rogers* and *Lowe* applies only to noncompetition agreements that actually restrict a former spouse from providing personal services after the marriage. In the present case, the district court did not distinguish between compensation to secure the transfer of corporate assets and compensation for a noncompetition agreement that actually restricts respondent's provision of personal services after the marriage. Although it is plausible that the noncompetition agreement restricted respondent's provision of personal services after the marriage, the record does not support a conclusion that respondent received the entire $200,000 in exchange for his agreement not to compete with PCI for three years.[1] Thus, the district court clearly erred in finding that the $200,-000 payment compensated respondent for his promise not to compete.

Because the record does not contain evidence showing how much, if any, of the noncompetition payment compensated respondent for postmarital income and employment opportunities lost due to his promise not to compete, we remand for the district court to make this determination. On remand, the district court is free to accept additional evidence that will be helpful in valuing the covenant not to compete.

Recognizing that there are few publications that address the valuation of noncompetition agreements in the context of a marital dissolution, we turned for guidance to cases that address valuation of noncompetition agreements in the context of income tax collections. Because these cases may also provide guidance to the trial court we address them in this opinion. By doing so, we do not intend to limit the inquiry of the trial court on remand.

Determining how much, if any, of a noncompetition payment is compensation for lost postmarital income and employment opportunities is difficult because the buyer and the seller value the agreement for different reasons. *Better Beverages, Inc. v. United States,* 619 F.2d 424, 429 (5th Cir.1980). To the buyer, the value of the noncompete is derived

> from the projected degree of increased profitability and likelihood of survival of its new enterprise attributable to the insulation of that enterprise, afforded by the covenant, from the deleterious competitive force that the seller could represent.

*Id.* Conversely, the value of the noncompete agreement to the seller is derived from the cost of foregoing a specific, future employment opportunity for a given period of time. *Id.* Because the interests sought by the buyer and seller are different, a noncompete agreement may have great value to the buyer but little value to the seller. *Id.*

Countervailing tax consequences generally ensure that the price the parties assign to a noncompete agreement represents the true value of that agreement to the seller. *See Schulz v. Commissioner of Internal Revenue,* 294 F.2d 52, 55 (9th Cir.1961) (countervailing tax considerations tend to limit schemes related to noncompete agreements). Amounts paid to the seller as compensation for the promise not to compete must be treated as compensation for lost earnings and are taxed as ordinary income. *Patterson v. Commissioner of Internal Revenue,* 810 F.2d 562, 569 (6th Cir.1987). But payments to the seller for the goodwill of the business are taxed at the more favorable rate for capital gains. *Id.* Conversely, any amount paid by the buyer as compensation for a promise not to compete is a business expense that may be amortized and deducted over the

---

1. Neither does the record support a conclusion that 25% of PCI's shares were worth $1,350,000. For purposes of the stock repurchase agreement, Piper Jaffray determined that PCI was worth $6.2 million if respondent signed a noncompetition agreement. Respondent signed a noncompetition agreement. If the value determined by Piper Jaffray was correct, 25% of PCI's stock was worth $1,550,000, but respondent received only $1,350,000 for 25% of PCI's stock. This means either that the Piper Jaffray valuation was not used to establish the price paid under the stock repurchase agreement or the full cost of the noncompetition agreement, which increased the value of all shares of PCI stock, was deducted from the value of the shares respondent sold to the corporation.

life of the covenant while any amount paid for goodwill is payment for a nonamortizable capital asset. *Id.* Assigning a high value to the noncompetition agreement produces more favorable tax consequences for the buyer while allocating a low price to the agreement produces more favorable tax consequences for the seller. *See id.* (commissioner's interest in tax treatment of noncompete limited to ensuring that transaction is reported consistently to prevent both parties from claiming treatment that produces least tax revenue).

But the price the parties assigned to the noncompetition agreement is not dispositive of the actual value of that agreement to the seller. *See Rogers,* 296 N.W.2d at 852 (although price in buy-sell agreement should not be ignored, court not required to accept that price as dispositive of value of husband's interest in company); *cf. Patterson,* 810 F.2d at 570 (although commissioner should be slow to go beyond values assigned to noncompetition agreement by taxpayers, substance must prevail over form especially when there is reason to suspect collusion or overreaching).

Here, the decree provision dividing the stock sale proceeds destroys the typical countervailing effect of the tax consequences of a noncompete payment. As in any case, the higher the amount of the sales proceeds designated as compensation for respondent's promise not to compete, the more beneficial the tax consequences for PCI. Unlike the typical case, however, the higher the amount designated as compensation for the noncompete agreement, the more beneficial the financial consequences are for respondent. At the highest combined state and federal income tax rate, respondent would have paid less than 50% of the amount designated as the noncompetition payment in taxes. *See* I.R.C. § 1 (Supp. V 1993) (highest income tax rate is 39.6%); Minn.Stat. § 290.06, subd. 2c (1992) (highest tax rate is 8.5%). But under the terms of the decree, respondent would have paid 50% of any proceeds not designated as a noncompetition payment to appellant. Thus, both PCI and respondent had a financial incentive to assign a high price to the noncompetition agreement. Accordingly, the $200,000 price the parties set for that agreement is not dispositive of the actual amount of compensation paid to respondent for postmarital income and employment opportunities lost due to his promise not to compete.

■ Some factors to consider when valuing the noncompetition agreement are: (1) the parties' intent; (2) whether the parties' tax treatment of the payment was in accordance with their stated intent; (3) whether the compensation paid for the covenant can be separated from the price paid for the goodwill; and (4) whether the noncompetition agreement is economically real. *See Forward Communications,* 608 F.2d at 489–91 (listing factors used to determine amount to allocate to noncompetition agreement in tax proceeding).

To satisfy the economic reality requirement,

> [t]he covenant must have some independent basis in fact or some arguable relationship with business reality such that reasonable men, genuinely concerned with their economic future, might bargain for such an agreement.

*Id.* at 491 (quoting *Schulz,* 294 F.2d at 55). When determining whether the noncompetition agreement is economically real, the court could consider whether respondent represented a competitive threat to PCI; whether the agreement was the product of arms-length dealing; whether the agreement played a meaningful role in the negotiations; and whether the agreement was enforceable. *See id.* at 493 (noncompetition agreement not economically real when no evidence showed seller ever intended to compete with buyer or would lose money due to promise not to compete).

## DECISION

A former spouse who sells marital stock and receives a separate payment from the corporation in exchange for a noncompetition agreement may only treat as nonmarital property the portion of the noncompetition

payment that compensates the spouse for restricting post-marital personal service. Because the district court did not distinguish between a noncompetition payment made to secure transfer of corporate assets and a noncompetition payment made to restrict personal service, we remand for the district court to determine how much, if any, of the $200,000 payment was compensation for restricting personal service.

**Reversed and remanded.**