WILLIAM B. JONES, JR., AND CHRISTINA B. JONES, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; DEXEL SYSTEMS CORPORATION OF WASHINGTON, D.C., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Jones v. Commissioner
Docket Nos. 26909-89, 28048-89
United States Tax Court
T.C. Memo 1993-162; 1993 Tax Ct. Memo LEXIS 163; 65 T.C.M. (CCH) 2396; April 14, 1993, Filed *163 Decision will be entered under Rule 155. For petitioners: Jonathan J. Broome, Jr. and Robert E. Scully, Jr.
For respondent: Karen E. Chandler. PARKER
PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: In these consolidated cases, [1] respondent determined deficiencies in and additions to the Federal income taxes of the individual petitioners and the corporate petitioner as follows: William B. Jones, Jr. and Christina B. Jones -- Docket No. 26909-89
Additions to Tax
Year
Deficiency
Sec. 6653(a)(1)
Sec. 6653(a)(2)
Sec. 6661
1985
$ 195,544
$ 9,777
*
$ 48,886
Additions to Tax
Year
Deficiency
Sec. 6653(a)(1)(A)
Sec. 6653(a)(1)(B)
Sec. 6661
1986
$ 86,723
$ 4,336
*
$ 21,681
*164 Dexel Systems Corporation of Washington, D. C. -- Docket No. 28048-89
Additions to Tax
Year
Deficiency
Sec. 6653(a)(1)
Sec. 6653(a)(2)
Sec. 6661
1985
$ 458,470
$ 22,924
**
$ 113,894
Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the taxable years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. After concessions, [2] the issues remaining for decision are: (1) Whether petitioner William B. Jones, Jr.'s purported 1985 stock sale was, in substance, a sale of an agreement not to compete by Dexel Systems Corporation of Washington, D.C., and the receipt of a constructive dividend by petitioner William B. Jones, Jr.; (2) Whether the individual petitioners and the corporate petitioner are liable for additions to tax for negligence or intentional disregard of rules or regulations under section 6653(a)(1) and (2) for the taxable year *165 1985; (3) Whether the individual petitioners are liable for additions to tax under section 6653(a)(1)(A) and (B) for the taxable year 1986; and (4) Whether the individual petitioners and the corporate petitioner are liable for additions to tax for substantial understatement of income tax under section 6661 for the years before the Court. *166 FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulations of facts and the exhibits attached thereto are incorporated herein by this reference. At the time the petition was filed, the individual petitioners maintained separate legal residences. Petitioner William Braun Jones, Jr. (petitioner or Braun Jones) resided in Alexandria, Virginia, and petitioner Christina B. Jones (Mrs. Jones) resided in Clearbrook, Virginia. Petitioner and Mrs. Jones timely filed, within the time period as extended, their joint United States individual income tax returns (Forms 1040) for the years 1985 and 1986 with the Office of the Internal Revenue Service in Memphis, Tennessee. The corporate petitioner, Dexel Systems Corporation of Washington, D.C. (Dexel), is a Virginia corporation having its principal office in Vienna, Virginia. Dexel timely filed its United States corporate income tax returns (Forms 1120) for the years 1985 and 1986 with the Office of the Internal Revenue Service in Memphis, Tennessee. A. History of Dexel
Between 1968 and 1978, petitioner was employed by International Business Machines (IBM) in various positions. In 1978, petitioner *167 left his position as an IBM marketing manager in Baltimore, Maryland, to start his own computer business. Dexel, originally named Information Systems Corporation (ISC), was incorporated in Virginia on January 24, 1978. Petitioner was one of the founders, shareholders, and original directors. [3]
*168 The business of Dexel initially was to develop customized software programs for various industries, such as accounting firms and collection agencies. Dexel employees, who were technical specialists in data processing, sold contract programming services to companies that already had data processing installations, i.e., computer hardware systems. In providing such services, Dexel employees frequently created entirely new customized computer programs for customers. Such software programs were thereafter "packaged" by Dexel with sales material and documentation and sold to similar businesses. As Dexel developed, it expanded from selling only software and services to "bundling" hardware into its packages. Dexel began providing consultation, planning, and operational advice and services to businesses regarding the acquisition, installation, maintenance, and uses of complete computer systems. Dexel offered "turnkey systems" that included the software, the hardware necessary to run the software, and the services and training necessary to install and operate the complete system. Dexel obtained the hardware offered in its turnkey systems from IBM, Hewlett Packard Corporation, [4] and, *169 at one time, TRW Corporation. By 1984, petitioner and W. Kellogg Achenbach (Achenbach) owned all of the issued and outstanding shares of Dexel. In June of 1984, petitioner and Achenbach entered into an agreement with Dexel providing that, if a shareholder were to die, Dexel would purchase the shareholder's shares with life insurance proceeds. [5]Dexel had a right of first refusal to buy any shares sold by a stockholder. See supra note 3. Dexel purchased an $ 800,000 policy on the life of Achenbach and a $ 1.2 million policy on the life of petitioner. In determining those amounts, petitioner did not refer to any specific business records or consult with any outside advisers or Dexel's comptroller. Petitioner and Achenbach informally evaluated Dexel's past performance, as reflected in the company's financial statements, estimated Dexel's future earnings to the extent that they were able, and reached *170 a valuation with which they were mutually satisfied. B. IBM's VAR Program
In the early 1980s, petitioner began to explore the possibility of contracting with IBM to sell IBM equipment as a value added remarketer. In the early 1980s, IBM began marketing computer systems through value added remarketers (VARs). VARs add software programs, which constitute the "value added" component, to midrange IBM computer systems. VARs then resell these packages through agents or directly to specific customers, known as unaffiliated end users. VARs are responsible for both the sale and the installation of the IBM equipment and the software that they develop. A VAR's relationship with IBM need not be exclusive; a VAR can sell hardware manufactured by other computer companies *171 as well. A VAR's customers are required to productively use the VAR's software, and such customers cannot resell or remarket the IBM computers purchased from a VAR. By the terms of its standard VAR contract, IBM can terminate a VAR's contract for failing to add the software value and merely reselling IBM hardware. From the beginning of its use of VARs, IBM has permitted VARs to use agents to generate sales leads and perform similar functions in making sales of IBM equipment. Some VAR agents are strictly software-oriented companies while others serve as conduits between manufacturers of hardware and of software and end users. By 1985, large leasing companies/brokers, such as Datacomp Group (now known as XL Data Company), Ceres, and Sun Data Corporation, were also VAR agents. C. Dexel's Relationship with IBM
In 1980, IBM began granting Dexel marketing rights and discount schedules on various products. Dexel had established to IBM's satisfaction that it had the software and service-support capability to bundle with IBM hardware. As IBM developed new products, Dexel would attempt to qualify to distribute them. Dexel would apply for a particular product, and IBM would investigate *172 to ensure that Dexel had the ability to successfully sell and support that product. In April of 1984, Dexel entered into an 18-month "Agreement for Volume Procurement of IBM Products (Value Added Remarketer)" (the VAR Agreement) to sell System 32 and System 34 computers. [6] That agreement was scheduled to expire in October of 1985. Dexel had had a VAR contract or contracts prior to April of 1984. Normally VAR contracts were for short terms of 1 year or 18 months. D. Jacore's History and Relationship with IBM
James L. Jacobson (Jacobson) first met petitioner in the early 1970s when both men were salesmen for IBM. Before Jacobson left his employment at IBM, he discussed with petitioner the possibility of his (Jacobson's) forming a company like Dexel in Atlanta, Georgia. In September of 1979, Jacobson left IBM and cofounded Dexel Systems Corporation of Atlanta (Dexel Atlanta). By that time, Dexel had established a reputation *173 for customized software. Jacobson wanted to use a similar name for its reputational value, but there was no common ownership or other control between Dexel and Dexel Atlanta. Dexel and Dexel Atlanta entered into a licensing arrangement whereby Dexel Atlanta could utilize Dexel's accounting software package in creating systems for its clients. Dexel Atlanta's primary business was as a software consulting and programming company for IBM general systems division's product lines. Dexel Atlanta began working with IBM sales representatives in selling and installing IBM hardware. In 1982, Dexel Atlanta also became an IBM VAR. Dexel Atlanta subsequently became known as Jacore Systems, Inc. (Jacore) and was incorporated in 1984. From the end of 1984 through 1987, Jacobson was chairman of Jacore's board of directors. During that period, C. Noel Wadsworth (Wadsworth) was the president and chief operating officer of Jacore and a member of Jacore's board of directors. During 1985 and 1986, Jacobson owned 85 percent of Jacore's stock and Wadsworth owned the remaining 15 percent. [7]
*174 During the first half of 1985, Jacore sold only IBM manufactured hardware. By 1985, Jacore had made a complete conversion from a firm directly selling and installing hardware and software turnkey systems to a company selling IBM hardware almost exclusively through an agent network. Dexel and Jacore used many of the same agents. In 1985 Dexel and Jacore were two of the largest VARs with reliable product sources selling through large leasing company/broker agents. Although other VARs competed with Jacore for sales of IBM equipment during the first 6 months of 1985, Dexel was Jacore's principal competitor during that period. E. Jacore's Problems with IBM
Jacore's VAR agreement was terminated by IBM on Good Friday, April 5, 1985. IBM notified Jacore that Jacore's customers were not productively using the software sold as part of the package. Jacore strongly contested the termination. As a result of several meetings with IBM, Jacore was able to obtain a short-term agreement (the Termination Agreement) that allowed it to purchase up to 540 computer systems from IBM for resale without having to comply with the productive-utilization requirement. The Termination Agreement *175 was to expire at the end of December 1985. Thereafter, Jacore would not be able to obtain or sell hardware from IBM. Thus, Jacore's objective was to sell each of the 540 computer systems allowed under the Termination Agreement as a "large system". By selling the computers with as much memory and disk space as possible, Jacore could charge the maximum price for each unit of IBM hardware. The discount margins were the same on both large and small systems, but a large system sold for $ 150,000 to $ 160,000, whereas a small system sold for $ 30,000 to $ 40,000. Jacore's anticipated gross profit on the sale of those 540 IBM computers under its Termination Agreement was approximately $ 4 million, with an anticipated net profit of approximately $ 2 million. That profit would allow Jacore the time it needed to secure other suppliers of hardware after December 31, 1985. F. Dexel's Problems with IBM
Throughout 1985, all hardware sold by Dexel was manufactured by IBM. During that year, Dexel had approximately 75 to 110 employees. Approximately 20 of those employees were directly involved in working with VAR agents, and approximately 70 to 80 employees worked with end users. Throughout *176 its years as a VAR, Dexel's VAR sales were cyclical. Usually, the fourth quarter of each year was the company's peak selling period. Dexel's fourth quarter sales often represented as much as 60 percent of Dexel's annual VAR sales. In early 1985, petitioner became concerned about Dexel's relationship with IBM. IBM had begun to terminate VARs whose end users were not productively using the value added software. Petitioner became aware that some of Dexel's customers were not putting software purchased from Dexel into productive use as required under Dexel's VAR Agreement with IBM. In February of 1985, IBM representatives contacted petitioner and asked that he and other Dexel officers come to Atlanta to review perceived problems with Dexel's compliance with its VAR Agreement. Petitioner, Edward F. Robinson (Dexel's vice president of operations), and Michael Atkins (Dexel's vice president of VAR marketing and sales) represented Dexel at that meeting. William A. Behan (corporate counsel for IBM), Larry D. Deaton (the IBM area manager responsible for Dexel's account), and R.K. Foley, Jr. (an IBM area manager) represented IBM. At that meeting, IBM presented Dexel with the new guidelines *177 it was developing to govern the VAR-agent relationship and the conduct of agents in finding and reselling to end users. Dexel officers were concerned that these guidelines represented a more restrictive set of policies and procedures than those in Dexel's original VAR Agreement and that Dexel would not be able to comply with these significant changes. Dexel had established an agent network that consisted of large leasing company/broker agents and hardware sales organizations. Dexel found it difficult to control the offerings that these agents would make to procure sales. The agents often provided sales referrals to Dexel that were not well screened in terms of the end users' plans to productively utilize Dexel's software. At the February meeting, IBM indicated that, thenceforth, it would insist that end users install the VAR's value added software in IBM's hardware computer systems and use the complete package in their daily businesses. IBM's new interpretation of "productive use" and the new agent guidelines would make it difficult for Dexel to continue its type of agent distribution network. Thus, at that time, Dexel had two major concerns regarding IBM's new policies: (1) *178 complying with IBM's new agent guidelines, and (2) complying with IBM's new interpretation of productive utilization of software. After the February meeting in Atlanta, Dexel executives began to formulate various programs to ensure that its customers properly would use the value added software purchased as part of the systems sold by Dexel. New marketing methods were considered, and analysis documents were developed to monitor use of Dexel software. Dexel agents were required to present for review by Dexel all of their proposed advertisements of IBM hardware and Dexel's turnkey systems. Also, during this time in early 1985, Dexel was actively seeking to obtain additional capital, to be acquired, or to locate a company with which it could merge. That was part of an ongoing effort that antedated the events of 1985 and that continued after the events involved in this case. Dexel officers saw the need to raise additional capital to move away from utilizing an agent distribution network and to fund a direct sales force. In addition to seeking venture capital, petitioner entered into an agreement with Broadview Associates, a mergers and acquisitions consulting firm, to locate a potential *179 merger partner. However, petitioner excluded certain companies from the scope of the agreement due to the ongoing discussions with those companies already taking place. Dexel periodically had such discussions with Doane Resources, Display Data Corporation, and Jacore. Although Dexel officers had contacted several companies about purchasing or merging with Dexel, none of these efforts proved fruitful. [8]Dexel also was not successful in locating venture capital. *180 In April of 1985, IBM conducted a survey of Dexel's end users and found that some had not installed or were not using the software purchased from Dexel. Dexel's own user survey confirmed that some of its end users were not using the software purchased from Dexel. On June 7, 1985, petitioner sent letters to two of Dexel's largest agents, Sun Data and XL Data Company, informing them that Dexel was in the process of auditing [9] orders placed by those companies to ensure that the contracts would be in compliance with IBM's new VAR guidelines. On June 11, 1985, petitioner and *181 Robinson again met with IBM representatives. Representing IBM at the meeting were Behan, Deaton, and Louis Kisber, IBM's marketing representative responsible for the Dexel account. Petitioner and Robinson feared that IBM had called the meeting to terminate Dexel as a VAR since Behan, IBM's attorney, was present at the meeting. However, IBM representatives once again merely wanted to discuss the specific changes they expected to be made by Dexel in its relationships with its agents. The substance of the meeting was resolving the problem of some of Dexel's end users not productively utilizing the software purchased as part of the VAR package. However, IBM did emphasize that, if significant changes were not made, Dexel's VAR Agreement would not be renewed on its scheduled expiration date in October. IBM informed Dexel that it would be reviewing Dexel's operations every 90 days for compliance. In response to the June 1985 meeting with IBM, petitioner called Charles Radigan, his personal attorney as well as Dexel's attorney, to discuss the difficulties that Dexel was encountering with IBM. Petitioner related to Radigan that there were other VARs whose software was not being used *182 by their customers and that he felt Dexel was being treated unfairly in being singled out by IBM for implementation of significant contract changes. Radigan suggested consulting with an antitrust attorney to determine if action against IBM would be feasible. Radigan also contacted Don Johnson, Jacore's counsel, to find out the nature of the reputed dispute between Jacore and IBM, the arguments Jacore used in negotiations with IBM, the people with whom Jacore negotiated, and other like information. Based on the advice of antitrust counsel and information gathered from Jacore, petitioner concluded that Dexel should not litigate its dispute with IBM. He decided to continue Dexel's program of curtailing agent activities and of implementing changes to comply with the new guidelines. As will be discussed below, it was also during this period in June of 1985 that petitioner was engaged in negotiations with Jacore. On June 25, 1985, Deaton wrote a letter to petitioner as a follow-up to the June 11th meeting. In that letter, he reviewed the issues that had been discussed in the meeting and restated IBM's concerns relating to Dexel's VAR Agreement. Deaton indicated that Dexel's request *183 for increased quantities of certain equipment was under review, pending the presentation by Dexel of a sufficient business plan to support those quantities. Deaton expressed the concern that Dexel did not have the ability to market, install, and support such quantities in compliance with its VAR Agreement. He emphasized that IBM's purpose was to ensure that a VAR's value added enhancement, when combined with IBM products, would provide an industry specific or unique solution to an end user's requirements. The value added enhancement should be the primary reason for the sale. Deaton also made clear that IBM was not satisfied that the procedures Dexel presented in February of 1985 had been implemented or properly monitored, consistent with Dexel's VAR obligations. On July 9, 1985, Robinson met with Kisber to discuss Dexel's business plan and Dexel's request for a "special bid discount". Dexel had a pending request to increase the numbers of systems (volume) it could purchase from IBM for resale as a VAR because IBM gave larger discounts for higher volumes. After discussions with Kisber, Robinson suggested to the other Dexel officers that they withdraw the special bid. Due to *184 Dexel's limited repertoire of vertical software packages, accomplishing both high volume sales and compliance with IBM's new requirements would not be feasible. "Vertical software" is certain software, for example accounting software, further specialized for a particular industry, such as the pharmaceutical industry. Thus, by definition, vertical software cannot be sold to a wide variety of customers. Dexel's officers recognized that generating high volumes of sales while ensuring proper productive utilization of the software would not be feasible. On July 23, 1985, petitioner sent Kisber a letter withdrawing Dexel's request for a special bid. Dexel was then in the process of complying with the new IBM rules and implementing the new agent guidelines, and, accordingly, Dexel would not be able to achieve the volumes contemplated by the special bid. This letter was carbon copied to Deaton, Robinson, and Atkins; blind carbon copies were also sent to Jacobson and Wadsworth of Jacore. [10]
*185 Another point of concern in complying with the VAR Agreement was whether Dexel's software was properly priced at a sufficiently high level to ensure that there was genuine interest in the software as part of the transaction. Usually, an agent would offer a discount on a hardware-software package to the end user. That discount often was large enough that the end user would acquire the software as a "throwaway" in order to obtain the hardware. Thus, Dexel increased its VAR prices per IBM system, including Dexel's software. Dexel also revised prices of packaged systems of hardware with software that was not normally sold in conjunction with VAR sales. On July 12, 1985, Atkins sent a memorandum to Dexel's agents informing them that Dexel would commence charging $ 1,250 more per central processing unit for its Dexel Accounting System software. He also stated that, due to VAR compliance requirements of productive utilization of software, a Dexel employee would be visiting their installations to audit compliance. On July 15, 1985, Robinson and Atkins sent a joint memorandum to Dexel agents outlining the procedures that must be adopted in selling, contracting, and installing systems *186 purchased from Dexel. On July 23, 1985, Atkins sent another memorandum revising dealer discounts to stress high value added software sales. G. Agreement with Jacore
In April of 1985, after IBM's adverse action, Jacobson called petitioner to tell him of Jacore's termination by IBM as a VAR and to discuss IBM's increased scrutiny of VAR agreements. In June of 1985, Jacobson contacted petitioner and initiated the discussions that led to the transaction at issue in this case. As stated, Jacobson had been able to negotiate an extension, until December of 1985, of Jacore's right to sell IBM hardware. Jacobson wanted to sell Jacore's allotment of 540 IBM systems by the end of 1985 without price competition from Dexel. Although Jacore had a higher special bid discount (40 percent) from IBM than Dexel (36 to 38 percent), Dexel had frequently undercut Jacore's prices in the past in order to make sales. Jacobson was seeking an agreement with petitioner to avoid such competition from Dexel for the remainder of 1985. During this telephone conversation with petitioner, Jacobson told petitioner that he had a short-term contract with IBM and that he was very concerned about Dexel as *187 a competitor. Jacobson wanted Dexel to stop competing against Jacore until Jacore's IBM contract expired on December 31, 1985. Petitioner responded that he wanted $ 2 million for such an agreement. Shortly thereafter, another telephone conversation occurred between petitioner and Jacobson in which Jacobson indicated he would pay only $ 1 million. Petitioner then stated that he wanted to structure the transaction as a stock sale rather than as a noncompetition agreement and also wanted to "take care" of the other shareholders by controlling all of Dexel's 1985 earnings. Jacobson concluded that, in order for Jacore to survive, eliminating Dexel as a competitor had to be his sole objective. Jacobson thus felt that he was not in a position to insist that the transaction take the form of a noncompetition agreement. He decided to do "whatever it took" to eliminate Dexel as a competitor for the next 6 months. On June 22, 1985, petitioner and Jacobson met to discuss an agreement. The focus of the meeting was to devise a plan by which Jacore could sell the IBM computers provided for in its Termination Agreement and compensate Dexel for forgoing large system sales and referring them *188 to Jacore. Petitioner and Jacobson discussed a number of different ways in which this goal could be accomplished. These negotiations were occurring during the same time period that Dexel was taking the various steps to conform to IBM's new VAR policies and guidelines and during the same time period that Dexel already anticipated reduction in the volume of its business as a result of its compliance with IBM's demands and new guidelines. Jacore had an extensive agent network, which petitioner hoped could refer to Dexel high value added sales leads that petitioner thought Jacore could not itself handle due to the lack of vertical software or support-service capabilities. Dexel had those capabilities and needed such leads and sales opportunities. However, many of Jacore's agents were already agents of Dexel, and Jacore still had its own software and support-service capabilities. In 1984, one of Jacobson's partners since 1980, Frank Souder (Souder), became uneasy about Jacore's rapid growth and emphasis on hardware sales. Souder wanted Jacore to remain a software services company. In 1984, Souder and Jacobson entered an agreement pursuant to which Jacobson bought Souder's interest *189 in Jacore. Souder subsequently established a software company in Atlanta, Georgia. However, Jacore did not lose its software, technical, and support capabilities as a result of that transaction. Although Jacore agreed to stop selling, installing, and supporting software on a local basis in Atlanta, the company maintained a technical staff to support the value added software that it was selling through its agent network. At the time of these negotiations with petitioner in June of 1985, however, Jacore was not concerned about software or support capabilities; its concern was to sell its allotment of IBM computer hardware. Jacore had 540 IBM systems which it had to sell by December 31, 1985, and Jacore wanted to eliminate competition from Dexel for that 6-month period. Jacore needed the profit from those sales to remain in business and to secure sources of computers other than IBM after 1985. Petitioner memorialized the discussions of the June 22, 1985, meeting in a memorandum dated June 24, 1985, which he sent to Robinson, Atkins, and Radigan. In that memorandum, petitioner stated that Jacobson had suggested that Dexel stop supplying high volume agents and refer them to Jacore *190 so as to guarantee that Jacore would meet its goal under the Termination Agreement. Petitioner stated that Jacobson had indicated to him that, in return, Jacore would refer all of its high value added agents and transactions to Dexel. Petitioner contemplated that "An accounting would be kept of what Dexel would forgo relative to the high volume agents between now and December 31st and what we would gain through the influx of high value added business. This tabulation would be netted monthly with the balance paid by one company to the other." In his memorandum, petitioner further stated that he and Jacobson also discussed merging Dexel and Jacore but decided against it: We also discussed the prospects of a merger or combining the two companies in some way to maximize the present situation and provide for a much stronger distribution company proceeding into 1986 and beyond. He has had extensive inter-action with DEC, AT&T, WANG, and others seeking alternatives to IBM. He is convinced that the combining of good software with capable hardware and distributing the package to agents/dealers is a long term business opportunity * * * The problem with any merger, or whatever, is the *191 time required to accomplish it. If we are to maximize the current situation between the companies and IBM, we must move quickly. Therefore, the arrangement or a modification of it, described [above] seemed to be appropriate for now.
Although Jacobson had previously discussed many times with petitioner the possibility of Jacore and Dexel merging, such a merger was not the purpose of these negotiations in 1985. Jacore's purpose was to eliminate Dexel as a competitor for 6 months. In subsequent discussions of his memorandum, petitioner and Robinson decided that it would not be prudent to disclose the proposed Jacore transaction to IBM. Between June 22, 1985 and July 11, 1985, petitioner and Jacobson further discussed details concerning the items listed in petitioner's memorandum. During this period, Jacobson and Wadsworth continued to discuss other ways to maximize Jacore's ability to sell IBM equipment during the last 6 months of 1985. Wadsworth did not participate in discussions between Jacobson and petitioner, but Jacobson did keep Wadsworth informed about these discussions. Prior to July 11, 1985, petitioner and Jacobson had agreed upon the basic elements of the transaction *192 but not its structure per se. By July 11, 1985, petitioner and Jacobson felt that they were close enough to an agreement to involve their legal counsel in a meeting in which they hoped that a formal, written agreement would be produced. On July 11, 1985, petitioner, Jacobson, Radigan, Wadsworth, and Don Johnson, Jacore's corporate counsel, met to negotiate and finalize an agreement. Petitioner characterized that meeting as the negotiation of the terms and conditions of the sale of his stock to Jacore. Petitioner suggested that the negotiations focused upon the sale of stock rather than just the referral of sales leads because the two companies had multiple longer-term objectives. However, during the second preliminary telephone conversation between petitioner and Jacobson prior to their June 22d meeting, petitioner had stated that he did not want to structure the transaction as a covenant not to compete but wanted some type of stock transaction for capital gains treatment. Petitioner had also informed Jacobson that he wanted to "take care of his people". Due to the immediate need to minimize competition with Dexel, Jacobson felt he was not in a position to insist upon the transaction's *193 being structured as a noncompetition agreement. When Wadsworth entered the negotiations, he was opposed to Jacore's buying stock in Dexel. Since Dexel was having the same problems with IBM as Jacore, Wadsworth did not view a combination of Dexel and Jacore as advancing either Jacore's business operations or prospects of making a public offering of stock. Further, he concluded that realistically there was no hope of either company individually or a combination of the companies going public considering the persistent problems with IBM. At that point, when various concerns about the transaction were being raised, petitioner and Jacobson left the general meeting and met privately in another office. In that private meeting, the focus became how to assure that petitioner could get his stock back. [11] As a result, unbeknownst to the attorneys and other officers of the two companies, petitioner and Jacobson executed an Agreement to Sell Stock (the Repurchase Agreement). In consideration of $ 10 paid by petitioner to Jacore, petitioner would have the option to buy all of the stock of Dexel owned by Jacore for a price equal to the book value of said stock. The Repurchase Agreement did *194 not specify the date as of which book value was to be calculated. Jacobson did not know the book value of Dexel's stock on July 11, 1985, but he assumed the repurchase price would be nominal since he felt he was paying $ 1 million for a noncompetition agreement to expire in January of 1986. The book value of 50 percent of Dexel's stock on July 11, 1985, less approximately $ 800,000 of 1985 earnings, was approximately $ 50,000. This secret Repurchase Agreement was effective from January 1, 1986, to January 1, 1987. Handwritten *195 on the bottom of the Repurchase Agreement was the statement that "James L. Jacobson guarantees that this option will apply to whoever purchases the aforementioned Dexel stock." This handwritten provision, signed by Jacobson, was added by petitioner because he and Jacobson foresaw that, as owner of record of the stock, Jacore could conceivably sell the stock to someone else. The $ 1 million purchase price for the transaction had been agreed upon prior to the private meeting between petitioner and Jacobson. Radigan, petitioner's counsel, believed that petitioner had agreed to lower his asking price from $ 2 to $ 1 million because he was assured that he would receive capital gains tax treatment on the transaction. [12] The fair market value of Dexel stock was not a factor in setting the purchase price. *196 Both men signed the Repurchase Agreement in private before the rest of the transaction was finalized. Petitioner and Jacobson did not inform the others present at the meeting of that agreement when they rejoined the main meeting. [13] They announced in the general meeting that they considered the deal to have been concluded, that petitioner had agreed to sell his stock, that Jacore was now a major stockholder of Dexel, and that everyone at Dexel was to cooperate fully with the transaction. By the end of the meeting, Radigan had prepared an outline of the terms of the agreement. In that outline, the following specific terms were listed: (1) Jacore would purchase 50 percent of the issued and outstanding *197 stock of Dexel for the sum of $ 1 million. It was noted that the stock should be free and clear of any liens or encumbrances and that petitioner had full power to sell the stock; (2) The 1985 earnings of Dexel would be distributed pursuant to the direction of the stockholders, and Jacore would cooperate to effectuate such distribution by voting its stock with petitioner at his direction on this issue; (3) The board of directors of Dexel would be expanded to six members, three of whom would be designated by Jacore. Petitioner agreed to cooperate by voting his stock with Jacore on this issue; (4) Jacore would have the option to purchase petitioner's remaining stock in Dexel at fair market value in the event of petitioner's death or voluntary departure from Dexel; (5) Jacore would vote its stock and support through its board designees an employment agreement for petitioner for a period of not less than one year; (6) Jacore would use its best efforts to borrow the stock purchase price and pay petitioner in cash. If the entire purchase price could not be paid in cash at closing, Jacore would execute a promissory note for the balance, payable $ 100,000 per month at 10 *198 percent interest. Jacobson and his wife agreed to personally guarantee payment of the purchase price. It was also agreed that the purchased Dexel stock would be retained by petitioner as security until the purchase price was paid in full. (7) Petitioner certified that Dexel had no unusual liabilities or substantial exposure except with respect to certain rebate problems and the Auditel sale, both of which had been discussed. It was agreed that the closing date would be on or before July 25, 1985.
Petitioner, Jacobson, and Wadsworth signed the handwritten document, which was captioned "Outline of Agreement Between W. Braun Jones, Jr. and Jacore Systems, Incorporated". Although Wadsworth was not involved in negotiating the secret Repurchase Agreement, he was aware of it when he signed the outline. He had been present at an earlier time when Jacobson offered to give petitioner a letter guaranteeing that petitioner could get his Dexel stock back after the first of 1986. When asked to attend the July 11th meeting, Johnson, as Jacore's corporate counsel, understood that one of Jacore's goals was to structure a transaction that would remove Dexel as a competitor of Jacore's *199 for sales of IBM equipment. Johnson was not involved in making the decision to structure the transaction as a stock sale. His role was to draft formal documents memorializing the transaction, utilizing Radigan's handwritten outline. Johnson was not aware of the Repurchase Agreement until some months after it was signed, and he first saw it in April of 1990. On July 19, 1985, Radigan met with Johnson in Johnson's office to finalize the transaction documents. That afternoon, the documents were signed by the principals at Jacore's headquarters in Atlanta. "An Agreement for Purchase of Stock of Dexel Systems Corporation of Washington, D.C. from W. Braun Jones, Jr. by Jacore Systems, Incorporated", formally setting forth the terms agreed upon at the July 11th meeting, was executed by petitioner and Wadsworth, as president of Jacore (the Purchase Agreement). [14] The purchase price stated for the 50,000 shares, which constituted 50 percent of the authorized, issued, and outstanding shares of Dexel, was $ 1 million. That amount, bearing an annual interest rate of 10 percent, was payable in installments. The first installment of $ 200,000 was due no later than September 30, 1985. *200 Installments of $ 100,000 each were due on the last day of each consecutive month thereafter, with the final payment's being due on May 31, 1986. Interest on the unpaid balance was due and payable with each monthly installment. Petitioner granted Jacore the right and option to purchase his remaining 5,000 shares of stock in Dexel, at its then current *201 fair market value, in the event of his death or voluntary cessation of employment with Dexel. Jacore granted petitioner an employment contract for 1 year from the closing date of the Purchase Agreement. In addition, Jacore also agreed that Dexel's 1985 earnings, some $ 800,000 at that time, would "be paid to existing Dexel employees or otherwise utilized pursuant to the direction of [petitioner]". Sections 4.8 and 4.9 of the Purchase Agreement provide, in part, that the execution or performance of the agreement would not conflict with or violate Dexel's VAR Agreement and note that IBM has contended that Dexel has not strictly complied with its VAR Agreement. IBM was not informed about this Purchase Agreement. Also, on July 19, 1985, a Stock Pledge Agreement was executed by petitioner and Wadsworth, as president of Jacore (the Pledge Agreement). In consideration of the extension of credit by petitioner to Jacore, Jacore pledged the purchased stock to petitioner until full payment of the purchase price was made. Petitioner was to retain possession of the shares as security and was appointed as attorney-in-fact to transfer the pledged shares on the books of Dexel to his name in *202 the event of a default. On July 19, 1985, Jacore executed a promissory note payable to petitioner in the amount of $ 1 million. Jacobson and his wife, Dayle B. Jacobson, executed personal guarantees of payment of the Jacore promissory note. On July 19, 1985, Jacobson and Wadsworth, in their capacities as the directors of Jacore, authorized themselves, as the officers of Jacore, to execute and deliver all documents and agreements necessary or convenient to effectuate the July 19, 1985, transaction. On the same date, Jacore agreed to continue to make efforts to obtain a bank loan to pay petitioner all or as much of the $ 1 million purchase price as possible. Any bank loan proceeds were to be applied as prepayment to the last installment due on Jacore's promissory note. To finance the transaction, Jacore obtained a $ 250,000 short-term loan from Citizens and Southern National Bank (C&S). The July 19, 1985, transaction had been completed before Jacore applied for this loan. H. Payments to Petitioner
On July 25, 1985, petitioner, Jacore, and C&S entered into a Subordination Agreement pursuant to which petitioner agreed to subordinate any indebtedness of Jacore to him to any *203 existing or thereafter incurred indebtedness of Jacore to C&S. Petitioner was permitted, under that agreement, to accept the $ 200,000 payment due on September 30, 1985, and the monthly $ 100,000 payments due until the $ 1 million promissory note from Jacore was paid in full. On July 29, 1985, petitioner's account was credited with $ 250,000 representing the proceeds of the C&S loan. Jacore credited these loan proceeds against the last two installment payments due on the $ 1 million note in accordance with the terms of the Purchase Agreement, eliminating the installment payments that would have been due on April 30, 1986, and May 30, 1986. The remaining $ 750,000 was paid as follows: September 30, 1985
$ 100,000
October 31, 1985
200,000
November 30, 1985
100,000
December 31, 1985
100,000
January 31, 1986
100,000
February 28, 1986
100,000
March 31, 1986
50,000
In addition to its principal payments, Jacore paid interest in the amount of $ 24,245 in 1985 and $ 6,766 in 1986. Jacore's August 31, 1985, financial statement reflected a $ 1 million investment in Dexel. This statement was prepared by Stephen A. Hafer, who became Jacore's comptroller in mid-July of 1985. *204 When Hafer joined Jacore, the company's books were in such poor condition that it took approximately 2 months to organize them in order to prepare financial statements. The August 31, 1985, financial statement was prepared during this period. I. Subsequent Operations of Jacore and Dexel
Jacobson and Wadsworth were never involved in, and did not regard Jacore as involved in, the management or day-to-day operations of Dexel. [15] *205 However, Jacobson attended one stockholders' meeting, was informed by telephone call after certain board meetings, and signed some minutes of such meetings. [16] See infra note 22. On July 24 and 26, 1985, Dexel refused to ship IBM equipment to end users of one of Dexel's largest leasing company/broker VAR agents, Datacomp Group (now known as XL Data Company). *206 Robinson wrote letters to a Datacomp Group officer, refunding the deposits paid by the company for the IBM equipment it had ordered. Dexel's internal audits had revealed that a number of the agent's end users still did not plan to install and productively use the VAR software as required by IBM. Consequently, Dexel could not sell the hardware packages to the agent without being in violation of the IBM guidelines. After July of 1985, it was clear to Jacore that Dexel was no longer competing for the high volume leasing company/broker agents' business. These leasing company/broker agents candidly acknowledged that they no longer could obtain IBM equipment from Dexel. In contrast to the first half of 1985, Jacore had exclusive arrangements to supply the high volume leasing company/broker agents with IBM equipment. In September of 1985, Dexel laid off its vice president of marketing, Michael Atkins. Atkins was the executive at Dexel directly involved in, and responsible for, VAR sales. During the last 6 months of 1985 Dexel did not compete against Jacore for sales of large IBM systems. On October 27, 1985, petitioner announced at a Dexel board meeting that he had been advised *207 that IBM was preparing a renewal of Dexel's VAR contract. On October 29, 1985, Robinson, acting for Dexel, signed a "Remarketer Agreement for IBM Products" with IBM. On December 12, 1985, petitioner sent a letter to Jacobson and Wadsworth, informing them that IBM owed Dexel equipment credits and that Dexel's principal bank, Sovran, had extended the maximum credit it was willing to extend without the corporate guarantee of Dexel's largest stockholder of record, Jacore. Jacobson, Wadsworth, and Jacore did not respond to this letter. No steps had been taken after the July 19, 1985, transaction to merge Dexel and Jacore or to combine their businesses in any way. Petitioner's letter also asked how the two companies were going to work together in 1986, what involvement Jacore would have directly in the operations of Dexel, and what IBM equipment Dexel would be required to provide to Jacore's agents, and he suggested that the three of them have a preliminary meeting to discuss these issues. However, Jacobson and Wadsworth did not expect Jacore to have any continuing relationship with Dexel in 1986. There was never any serious consideration or realistic possibility that Dexel and Jacore *208 would merge or combine their businesses in any way or that Dexel could serve as a source of IBM hardware for Jacore after December 31, 1985. [17]
*209 Jacore was able to sell all 540 IBM systems by the end of 1985. Most of the sales were made in December, which was unusual, although the fourth quarter was usually the strongest quarter for sales. This result was achieved because Jacore's prime competitor, Dexel, had been eliminated for that 6-month period. By the end of 1985, Jacore was in good financial condition and thereafter arranged to begin selling AT&T and Digital equipment. J. Petitioner's Subsequent Actions
In the fall of 1985, petitioner decided to take a leave of absence from Dexel due to marital problems. He finalized his plans in late December of 1985 or early January of 1986. Petitioner promoted Robinson to president of Dexel. On January 7, 1986, the Dexel board met and voted to approve Robinson as president. Petitioner resigned as president but continued in his role as chairman of Dexel's board of directors. Petitioner was aware that Dexel's standard VAR Agreement with IBM contained a clause stating that IBM may terminate the agreement if there are any material changes in the management or control of Dexel. Petitioner knew that his resignation as president of Dexel or the purchase of his stock by Jacore *210 would be a material change, but he did not inform IBM of either. Petitioner went to the Caribbean during his leave of absence and considered starting a charter boat business. While in the Caribbean, petitioner lived on his boat and had no fixed mailing address. He did not make arrangements before he left to have mail forwarded to him. The installment checks he received from Jacore were deposited into his personal bank account by his secretary without endorsement. Petitioner remained in the Caribbean from the end of January to the first part of May of 1986. Petitioner had telephone conversations with Robinson approximately once a month during his absence. There is no indication that any board meetings were held during his absence. Petitioner also had one telephone conversation with Jacobson in March of 1986. The record is unclear as to what he and Jacobson discussed. [18]
*211 On March 21, 1986, Stephen Hafer, Jacore's vice president of finance and chief financial officer, wrote a letter to Radigan, Dexel's attorney, stating that petitioner and Jacobson had spoken on March 5, 1986, and had agreed that petitioner would repurchase his Dexel stock for $ 40,000, as determined under Article 2 of the enclosed Stock Purchase Agreement. [19] *212 Enclosed with the letter were two copies of the Stock Purchase Agreement, executed by Jacobson on behalf of Jacore, memorializing the terms of the repurchase. Hafer requested that petitioner return one of the fully executed originals for Jacore's files. Hafer also enclosed a check for $ 10,287.66, which he stated represented Jacore's final payment of $ 50,000 plus interest for 21 days, less the $ 40,000 repurchase price, calculated in accordance with Article 3 of the Stock Purchase Agreement. [20] This final payment was deposited in petitioner's account in March of 1986. The Stock Purchase Agreement was made effective as of December 31, 1985. Hafer's letter of March 21, 1986, was the first time Radigan learned of the secret Repurchase Agreement Jacobson and petitioner had executed on July 11, 1985. When petitioner returned from the Caribbean, he reimmersed himself into the operations of Dexel. On May 29, 1986, a special meeting of Dexel's board was held to discuss Dexel's financial condition and the steps to take to improve it. [21]
*213 On July 17, 1986, petitioner sent a letter to William Slayton III of Sovran Bank, the bank in which Dexel had its accounts. Petitioner stated that he had repurchased his Dexel stock from Jacore. This letter was to confirm that Sovran Bank would lend Dexel up to $ 240,000 in lieu of reinstating the company's line of credit. On July 21, 1986, a Dexel board meeting was held in which the board accepted the resignations of Jacobson, Wadsworth, Hafer, Dom Carpentieri, and Jerry Leverette. [22] The minutes state that these resignations were "appropriate in as much [sic] as Braun Jones has purchased the stock that he sold to Jacore." *214 Petitioner testified that he did not see the Stock Purchase Agreement until May of 1986 upon returning from the Caribbean. He consulted Radigan regarding the Stock Purchase Agreement and the consequences of repurchasing his Dexel stock. After his review, Radigan told petitioner that he was concerned that the effective date of the Repurchase Agreement had been changed to December 31, 1985, and that there was such a large difference between the amount Jacore had paid for the stock and the price petitioner was paying to repurchase it. Radigan advised petitioner to obtain a written tax opinion before signing the Stock Purchase Agreement. On June 4, 1986, petitioner asked Melvyn L. Lieberman (Lieberman), his certified public accountant, to review the Stock Purchase Agreement and to advise him if execution of the agreement would preclude him from claiming capital gains treatment on the stock sale transaction. Lieberman advised petitioner that such repurchase would not invalidate an otherwise valid stock sale. [23]
*215 On July 25, 1986, petitioner sent a letter to Jacobson, enclosing the executed Stock Purchase Agreement. In that letter, he stated that "I agree that it is best for all that I exercise my option to repurchase the Dexel stock" and confirmed that $ 40,000 was the price for the repurchase of the stock. "I paid this by your deduction of $ 40,000 from the final payment made to me as required by our original stock purchase payment." By the end of 1986, Dexel's financial situation had greatly improved. During the shareholders' meeting held in August of 1986, petitioner stated that the "company appears to be making a profit" although certain divisions were experiencing losses. As previously noted, it was usual for the company to experience a strong fourth quarter performance. On their joint Federal income tax return for 1985, the individual petitioners reported the transaction with Jacore on Form 6252 as an installment sale with a gross profit of $ 996,000. The individual petitioners reported receiving payments of $ 650,000 in 1985, $ 647,400 of which was reported as long-term capital gain. Of that amount, $ 257,712 was reported as taxable. The individual petitioners reported interest *216 income from Jacore in the amount of $ 24,245. On their joint Federal income tax return for 1986, the individual petitioners again reported the Jacore transaction as an installment sale with a gross profit of $ 996,000. The individual petitioners reported receiving payments of $ 310,000 in 1986, $ 308,760 of which was reported as long-term capital gain. Of that amount, $ 126,252 was reported as taxable. The individual petitioners reported no interest income from Jacore for the taxable year 1986. Dexel, an accrual basis taxpayer, reported no income or tax liability on its 1985 and 1986 Federal corporate income tax returns with respect to the Jacore transaction. OPINION Petitioner argues that the transaction was a sale of his Dexel stock to Jacore and thus was the sale of an asset qualifying for capital gains treatment. He asserts that this stock sale was not a sham transaction. He states that the transaction had economic substance because it had a reasonable possibility for profit apart from the tax benefits enjoyed. Petitioner further argues that the exercise of his option to repurchase the Dexel stock should not affect the bona fide original sale of the stock. Petitioner *217 asserts that the amounts received by him from Jacore as the purchase price for his stock are not includable in the gross income of Dexel. Respondent does not argue that the transaction was an economic sham. Respondent agrees that the transaction had the requisite business purpose and profit potential, but disagrees that the transaction should be characterized as a bona fide stock sale. Rather, respondent urges this Court to apply a substance over form analysis and to hold that this transaction should be recharacterized as the sale of a covenant not to compete. "In proper cases the commissioner can go beyond the formal dealings of the parties to see if these forms reflect meaningful substance." Schulz v. Commissioner, 294 F.2d 52, 56 (9th Cir. 1961), affg. 34 T.C. 235 (1960). This ability and duty are especially warranted when there is reason to suspect that the participants in a transaction improperly attempted to avoid the tax consequences of their actions. Patterson v. Commissioner, 810 F.2d 562 (6th Cir. 1987), affg. T.C. Memo. 1985-53. The Supreme Court has *218 recognized that this principle is a fundamental one in the law of taxation. Schulz v. Commissioner, 294 F.2d at 56 (citing Commissioner v. Court Holding Co., 324 U.S. 331 (1945), and Gregory v. Helvering, 293 U.S. 465 (1935)). Respondent recharacterizes petitioner's purported sale of his Dexel stock to Jacore as, in substance, Dexel's sale of a noncompetition agreement to Jacore. Consequently, respondent asserts that all proceeds of this sale, including interest, are taxable as ordinary income to Dexel. See Peterson Machine Tool, Inc. v. Commissioner, 79 T.C. 72, 80 (1982), affd. without published opinion (10th Cir. 1984). Moreover, respondent points out that, since the proceeds were diverted by petitioner to his own personal bank account, the proceeds are constructive dividends to petitioner and are taxable as ordinary income in the year received. Secs. 61(a)(7), 316(a). [24]
*219 The substance of a transaction, not its form, controls its tax consequences. Penrod v. Commissioner, 88 T.C. 1415, 1427 (1987). The "substance over form" analysis is a judicially developed principle that attempts to address "the extent to which legal consequences should turn on the substance of a transaction rather than on its form." Bittker & Eustice, Federal Income Taxation of Corporations and Shareholders, par. 1.05, at 1-15 (5th ed. 1987). The Supreme Court has held that: The incidence of taxation depends upon the substance of a transaction. * * * the transaction must be viewed as a whole, and each step, from the commencement of negotiations to the consummation of the sale, is relevant. * * * To permit the true nature of a transaction to be disguised by mere formalisms, which exist solely to alter tax liabilities, would seriously impair the effective administration of the tax policies of Congress.
Commissioner v. Court Holding Co., 324 U.S. 331, 334 (1945). Furthermore, it is incumbent upon a court to study "the motivating factors and the basic business and economic considerations upon which the ultimate *220 agreement was grounded" in order to decide the true substance of the transaction. Grinnell Corp. v. United States, 182 Ct.Cl. 702, 390 F.2d 932, 944 (1968). We think, in this case, that petitioner has attempted to disguise the true nature of his transaction with Jacore in order to alter his tax liabilities. In considering the substance and the form of the transaction at issue, we are convinced that, in reality, Dexel sold to Jacore a covenant not to compete and that petitioner has received a constructive dividend from Dexel. We did not find petitioner to be a credible witness. [25] We do not think that petitioner and Jacobson had any intent to merge business operations. Jacobson contacted petitioner specifically to discuss a noncompetition agreement. The resulting transaction was designed by petitioner to suit his own business and personal plans. Petitioner was initially hesitant about complying with IBM's new VAR guidelines and was contemplating taking antitrust action. However, petitioner was advised that action against IBM was not likely to be successful. Fortuitously, during the same period, petitioner received a call from *221 Jacobson, who stated that Jacore was willing to pay for Dexel to forgo sales that petitioner already knew violated IBM's new guidelines and would have to be forgone if Dexel was to "remain all Blue" (i.e., sell only IBM computers). *222 Knowing of Jacore's termination by IBM and of its short-term Termination Agreement, petitioner was in a position to insist upon the form and terms of the transaction he desired and to direct Dexel to begin vigorously complying with the IBM guidelines, which effectively removed Dexel as Jacore's competitor. Dexel canceled its sales of IBM equipment through its large leasing company/broker agents and no longer competed with Jacore for sales through these agents. Dexel withdrew a special bid with IBM to purchase larger volumes of equipment to sell under its VAR Agreement. Dexel also terminated its marketing vice president who was responsible for VAR sales. By Dexel's actions, IBM was apprised of Dexel's compliance with the new VAR guidelines and Jacore was apprised of Dexel's compliance with the noncompetition agreement. Petitioner proverbially killed the two birds with one stone. The purported sale of Dexel stock coupled with the Repurchase Agreement allowed petitioner to receive $ 1 million directly (thus avoiding taxation at the corporate level), to mollify the other officers and shareholders of Dexel by arranging bonuses for them out of Dexel's 1985 earnings, to take a leave *223 of absence aboard his boat in the Caribbean, and to ensure that he could return to Dexel as 55-percent owner when he concluded his Caribbean stay. Petitioner cites the principle that: The presence in an agreement of sale of stock providing for its repurchase by the seller upon condition does not in itself destroy the then completed sale to the purchaser, nor does such an agreement alone revest any title in the original seller. It is merely an unexecuted option to rescind the original completed sale.
Wyman v. Commissioner, 33 T.C. 622, 628 (1959) (citing Torrens v. Commissioner, 31 B.T.A. 787, 794 (1934)). In this case, it is not a question of whether the Repurchase Agreement destroys the original stock sale: the original stock sale itself, in substance, did not occur. The purported stock sale in this case was, in substance, the sale of a noncompetition agreement. See Fazzio v. Commissioner, T.C. Memo. 1990-608, affd. 959 F.2d 630 (6th Cir. 1992), where the Court also looked through form to substance, finding that corporate earnings were diverted in *224 the guise of a sale of stock. Petitioner makes other arguments to bolster his position that this transaction constituted a bona fide stock sale. First, petitioner asserts that Jacore, through Jacobson and Wadsworth, took an active part in managing Dexel by voting its Dexel stock and by having representatives on Dexel's board of directors. Second, petitioner contends that this stock sale represents the first step in Dexel's merging operations with Jacore and in working towards a future joint initial public offering of stock. Finally, petitioner argues that he engaged in arm's-length negotiations with Jacore and that Jacore paid him a price based upon the fair market value of his Dexel stock. None of these arguments is supported by the record. Although petitioner contacted or sent correspondence to Jacore officers advising of certain actions taken or soliciting their advice on various matters, we are satisfied that Jacore officers were never involved in the control or management of Dexel. See supra note 15. No evidence was submitted that Jacore officers responded to petitioner's correspondence in an attempt to influence, direct, or become significantly involved in Dexel's *225 management. After the stock transaction, petitioner continued to run Dexel as he had before. Jacore's members of Dexel's board of directors generally did not attend board meetings but merely signed the subsequently produced minutes of the meetings. See supra notes 16 and 22. They "voted" their stock as predetermined by the original Purchase Agreement. Jacobson and Wadsworth credibly testified that they did not serve as active managers of Dexel. Jacobson did not see Jacore as a real stockholder of Dexel due to the Repurchase Agreement. In petitioner's December 12, 1985, letter to Jacobson, it does not appear that the companies were operating as a merged entity contemplating a public offering: he asked Jacobson how the two companies were going to work together in 1986 and what involvement Jacore was planning to have in the operations of Dexel. Jacobson testified that a merger between the two companies was discussed a number of times, both before and after the events of this case, but that it never made any sense and was not the purpose of the transaction in this case. He explained that as a VAR, a company has no more than a possible succession of short-term contracts with *226 its suppliers and no guarantees for renewals. Consequently, it would be quite difficult for a VAR to launch a public offering based upon such 1-year or 18-month contracts. Petitioner himself stated, at the beginning of negotiations with Jacobson, that a merger of the two companies was not feasible in the time period within which the companies needed to act in order to mutually benefit from the 1985 situation. Petitioner also admitted that, as of January 1, 1986, the date on which the Repurchase Agreement became effective, it would not have been possible to determine if any "merger" of the two companies was or would be successful. We think that, even by July of 1986 when petitioner states he repurchased his stock, it was still premature to make such a decision, given that the companies' strongest showings usually occurred in the fourth quarter of the year. We think that petitioner insisted upon the transaction's taking the form of a stock sale when he learned that he could receive capital gains tax treatment. Petitioner's own counsel, Radigan, stated that petitioner lowered his asking price to $ 1 million after receiving advice concerning capital gains treatment. Petitioner *227 counters that Jacore purchased petitioner's Dexel stock at fair market value. He argues that $ 1 million represented the fair market value of 50 percent of the company's stock because Jacore was purchasing the future income stream of a sales and distribution business as well as continued access to IBM equipment through Dexel's VAR agreement. There is no evidence that $ 1 million was the fair market value of 50 percent of Dexel's stock at the time of the transaction. Although closely held businesses are often quite difficult to value, in this case no attempt was ever made to establish the fair market value of Dexel stock. No attempt was made to value the stock either in 1985 or during the trial of this case. In June of 1984, the value of all of the issued and outstanding shares of Dexel informally was determined to be $ 2 million when life insurance policies were purchased for petitioner and Achenbach. In March of 1985, Robinson purchased 5,000 shares of Dexel at the informally determined price of $ 1 per share. The "arm's-length negotiations" in the Jacore transaction involved figures between $ 2 million and $ 1 million. The $ 1 million amount was agreed to by petitioner not *228 because it was the stock's fair market value but because he was assured that (1) the transaction could be structured in a manner in which he would be afforded capital gains treatment, (2) he would have the option to repurchase his stock from Jacore or any subsequent purchaser for a 1-year period commencing in January of 1986, (3) he would retain control over all of Dexel's 1985 earnings, and (4) he would continue to be employed by Dexel at his present position and salary. No dollar values were assigned to any of these elements of the transaction. Furthermore, no attempt was made to ensure that Jacobson would receive a refund of a substantial portion of his purchase price if the transaction was not successful, as petitioner claims was an objective. See supra note 11. All of these facts lead us to conclude that the $ 1 million was paid for a noncompetition agreement. Unlike the agreement in Patterson v. Commissioner, 810 F.2d 562 (6th Cir. 1987), affg. T.C. Memo. 1985-53, the agreement between petitioner and Jacore makes no mention of a covenant not to compete. In the present case, there is not an allocation issue as *229 in Patterson, but a characterization issue. Whether the entire form of the transaction must be disregarded and a new characterization constructed to reflect the true substance of the transaction depends, of course, upon the particular facts and circumstances of the case. The critical facts can be summarized as follows. The corporations, Dexel and Jacore, were both value added remarketers (VARs) of IBM computer equipment. In early 1985 both companies were encountering problems with IBM because of their failure to assure IBM that their customers (unaffiliated end users) would productively use the software (the "value added" component) each company sold along with the IBM hardware, as required by their VAR Agreements. In early April of 1985, IBM terminated Jacore's VAR Agreement. However, Jacore was able to negotiate a Termination Agreement whereby IBM would allow it to purchase and resell 540 IBM systems by December 31, 1985, without regard to the productive-use requirements, essentially just sales of hardware. Dexel meantime was trying to satisfy IBM's productive-use requirements, avoid termination of its VAR Agreement, and "remain all Blue". Dexel, however, was also the *230 principal competitor of Jacore at that time. Jacore wanted to eliminate Dexel as a competitor for the rest of 1985 in order to sell its final allotment of IBM hardware without price competition. Jacobson, the majority shareholder of Jacore, contacted petitioner, the majority shareholder of Dexel, and sought an agreement by Dexel not to compete for the next 6 months. Petitioner asked for $ 2 million for such an agreement, but later agreed to $ 1 million if the transaction was structured as a sale of has stock so he could receive capital gains tax treatment. Petitioner also wanted and was assured continued employment under the same terms and the right to retain control over some $ 800,000 of Dexel's 1985 earnings. Believing that Jacore's economic survival was at stake and that he had to do "whatever it took" to eliminate competition by Dexel, Jacobson felt he could not insist that the arrangement be structured as a simple noncompetition agreement, as he desired. Jacobson, petitioner, and their attorneys met to conclude negotiations and formalize the written agreement. Unbeknownst to their respective attorneys, Jacobson and petitioner met privately and executed a secret agreement *231 that petitioner could repurchase his stock in 1986 for its book value, a nominal amount. Their attorneys then drafted the stock purchase agreement without having any knowledge of the existence of the stock repurchase agreement. The various corporate formalities of a stock sale were carefully documented. Petitioner was paid $ 1 million. Dexel did not actively compete against Jacore for sales of large IBM systems for the rest of 1985. Jacore was able to sell the 540 units by December 31, 1985, made a good profit on those sales, and thereafter began selling computers manufactured by companies other than IBM. Jacobson and Jacore were never involved in the management or day-to-day operations of Dexel, although various documents prepared by petitioner try to suggest otherwise. In early 1986 petitioner took a leave of absence from Dexel because of marital problems, spent about 3 months in the Caribbean aboard his boat, and then returned and repurchased his Dexel stock for $ 40,000. Although required by the terms of the VAR Agreement to advise IBM of any material changes in management or control of Dexel, petitioner never advised IBM of his purported sale of his Dexel stock for $ *232 1 million in 1985 nor of his purported repurchase of the same for $ 40,000 in 1986. Jacobson always considered it a "given" that petitioner would get his stock back in 1986. Jacobson regarded the transaction as "basically giving Braun Jones a million dollars to step out of the way for six months". Petitioner insisted upon retaining control of all of the 1985 earnings of Dexel, ostensibly to avoid "looting" of the company. As petitioner himself stated, as long as the money stayed in Dexel, to be used for ordinary and necessary Dexel expenses, he had no problem with Jacore's owning 50 percent of the company. His "baby", as he referred to Dexel during his testimony, remained intact, to be managed as he saw fit despite his purportedly being only a 5-percent shareholder. Thus, petitioner received $ 1 million from Jacore, plus had $ 800,000 of Dexel's 1985 earnings under his control, $ 165,000 of which he paid to himself as a bonus. He was then able to repurchase his stock for $ 40,000 within a year of the original sale. Based on the above facts and the record as a whole, the Court concludes that there was no bona fide sale of petitioner's Dexel stock, that the 1985 agreement with *233 Jacore was, in substance, an agreement that Dexel would not compete against Jacore for the rest of 1985. Our decision in this case should not be taken to mean that "the form which the parties use to effectuate their transaction should be given no consideration". Schulz v. Commissioner, 294 F.2d 52, 55 (9th Cir. 1961), affg. 34 T.C. 235 (1960). The form and the substance of a transaction must reflect the business and economic realities underlying the transaction. However, in this case, the form of the transaction chosen by the petitioner does not reflect the reality of the agreement. The substance of the transaction was that Dexel would not compete against Jacore for sales of large IBM systems for the remainder of 1985. Therefore, we uphold respondent's recharacterization of the sale of stock by petitioner as the sale by Dexel to Jacore of a covenant not to compete, ordinary income to Dexel, and the receipt by petitioner of a constructive dividend. Additions to Tax under Section 6653(a)(1) and (2) or (a)(1)(A) and (B)
For taxable year 1985, section 6653(a)(1) provides that, if any part of any underpayment is *234 due to negligence or intentional disregard of rules or regulations, there shall be an addition to tax equal to 5 percent of the underpayment. Section 6653(a)(2) provides for a separate addition to tax equal to 50 percent of the interest payable under section 6601 on the portion of the underpayment attributable to negligence or intentional disregard of the rules or regulations. For taxable year 1986, the comparable provision for such additions is found in section 6653(a)(1)(A) and (B). For purposes of this provision, negligence is the lack of due care or the failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). Respondent's determination of negligence is presumed correct. The taxpayers bear the burden of proving otherwise. Bixby v. Commissioner, 58 T.C. 757, 791 (1972). Petitioner argues that reasonable reliance on the advice of an expert avoids the addition to tax for negligence. Petitioner sought the opinion of his certified public accountant, Melvyn L. Lieberman (Lieberman). Lieberman prepared a tax opinion letter concluding *235 that the Repurchase Agreement would not invalidate an otherwise bona fide stock sale and that the transaction constituted a valid sale and repurchase of a capital asset and should be treated accordingly for Federal income tax purposes on the individual petitioners' returns. Petitioner states that he relied upon Lieberman's advice and reported the transactions accordingly on the 1985 and 1986 returns. A taxpayer has the duty to file complete and accurate tax returns and normally cannot avoid this duty to file by placing responsibility with an agent. United States v. Boyle, 469 U.S. 241, 250-251 (1985). However, under limited circumstances, a taxpayer may avoid liability for the negligence addition by good faith reliance upon expert tax advice to satisfy the reasonable person standard. Jackson v. Commissioner, 86 T.C. 492, 539-540 (1986), affd. 864 F.2d 1521 (10th Cir. 1989). In order to use reliance upon professional advice as a defense, however, a taxpayer must have provided his tax adviser with complete and correct information, and the error must be due to that adviser's mistake. Pessin v. Commissioner, 59 T.C. 473, 489 (1972). *236 Moreover, this reliance is a factor to be considered by the Court: it is not an absolute defense to negligence, and the reliance must be reasonable. Freytag v. Commissioner, 89 T.C. 849, 888 (1987), affd. 904 F.2d 1011, 1017 (5th Cir. 1990), affd. on another issue 501 U.S.    , 111 S.Ct. 2631 (1991). Petitioner did not provide Lieberman with complete and correct information. Lieberman requested, but never received, a copy of the July 11, 1985, Repurchase Agreement. Lieberman's opinion was based solely upon oral statements and documents furnished by petitioner. Lieberman heard only one side of the story. See supra note 23. We do not think that Lieberman was sufficiently aware of the facts and the dynamics of the transaction to have been able to render an opinion upon which petitioner now can rely upon to avoid the negligence addition to tax. Thus, we find that both the individual and corporate petitioners have failed to carry their burden. Therefore, we sustain respondent's determinations. Additions to Tax under Section 6661
Section 6661(a) imposes an addition to tax of 25 *237 percent of the amount of any underpayment of tax attributable to a substantial understatement of income tax. An understatement of tax is considered substantial if it exceeds the greater of 10 percent of the tax required to be shown on the return, or $ 5,000. Sec. 6661(b)(1). In calculating understatements under section 6661(a), items for which there is substantial authority or with respect to which all relevant facts were adequately disclosed on the return (or on an attachment to the return) are not to be considered. Sec. 6661(b)(2)(B). Petitioner contends that he had substantial authority for the reported tax treatment of the transaction at issue. The deficiencies that we have sustained for taxable years 1985 and 1986 qualify as substantial understatements as defined in section 6661(b)(1). Petitioners have not met their burden of proving that respondent's determination was incorrect. Section 1.6661-3, Income Tax Regs., defines "substantial authority". Petitioners have presented no substantial authority for the positions they have taken. There was no adequate disclosure of the relevant facts on the individual or the corporate returns. Therefore, we sustain respondent's *238 determinations. To reflect the above holdings and the parties' concessions, Decisions will be entered under Rule 155. Footnotes
1. The cases of petitioners William B. Jones, Jr. and Christina B. Jones, docket No. 26909-89, and petitioner Dexel Systems Corporation of Washington, D.C., docket No. 28048-89, were consolidated for purposes of trial, briefing, and opinion.↩
*. 50 percent of the interest due on the entire deficiency.↩
**. 50 percent of the interest due on $ 455,576 of the deficiency.↩
2. The individual petitioners have conceded the following adjustments in the statutory notice of deficiency: (1) disallowance of claimed yacht expenses for 1985 in the amount of $ 27,796; (2) disallowance of claimed expenses relating to petitioners' dog kennel activity for 1985 in the amount of $ 1,666 and for 1986 in the amount of $ 4,326; (3) inclusion of additional income in the amount of $ 4,500 in each of the years 1985 and 1986 resulting from the personal use of a leased corporate automobile; (4) inclusion of additional income of $ 6,026 in 1985 representing lease income received from petitioner William B. Jones, Jr.'s employer in excess of verified lease expenses allowed by respondent; (5) disallowance of $ 185 of interest expense claimed on Schedule A of 1985 return; (6) allowance of an additional $ 603 in employee business expense deductions in 1985; and (7) disallowance of $ 2,343 of claimed employee business expense deductions in 1986.↩
3. On February 14, 1979, ISC and its shareholders entered into an "Agreement Between Stockholders and Company to Purchase Stock". The shareholders of ISC at that time were petitioner (52.5 shares), W. Kellogg Achenbach (37.5 shares), Charles C. Grammick (30 shares), and Bruce D. Lisle (30 shares). That agreement provided for the acquisition of the stock of a shareholder by ISC in the event of a shareholder's death. Funds would be available for such an acquisition through the company's purchase of life insurance policies on the lives of the shareholders. The agreement also provided that, if a "Stockholder desires to sell all or part of his stock, he shall give written notice of such election to the Company, and the Company shall then have the right, exercisable within 30 days, to purchase such stock." The agreement required that the stock certificates of each shareholder bear a legend that the stock is transferable only upon compliance with the provisions of that agreement.↩
4. Dexel had a subsidiary, Computer Applications, that sold Hewlett Packard computers, software, and services.↩
5. This agreement was prompted by Achenbach's decision to embark upon a lengthy sailing trip across the Atlantic Ocean in a small boat. Both petitioner and Achenbach wanted to ensure the continuity of Dexel should anything happen to either of them.↩
6. In August of 1984, the System 36 was added to the contract as approved VAR equipment.↩
7. Jacore elected subchapter S tax status as of August 1, 1985. The making of that election had been considered and discussed in previous years. In 1984, Arthur Andersen, Jacore's then new accounting firm, recommended that the subchapter S election be made. However, the election did not take effect until August of 1985.↩
8. Dexel did merge with one of its subsidiaries during this period. Dexel Systems Corporation of Hagerstown (Hagerstown) was a subsidiary of Dexel that sold Dexel's credit union software products directly to credit unions around the country. Dexel owned 60 percent of Hagerstown's stock. On March 6, 1985, Dexel's board of directors voted to merge Hagerstown into Dexel by exchanging Dexel stock for the remaining 40 percent of Hagerstown's stock, which was owned by brothers, Doug Karn and Terry Karn. As of March 6, 1985, after the conclusion of the tax-free exchange of Hagerstown stock, the stock of Dexel was owned as follows: William Braun Jones, Jr.
55,750 shares
W. Kellogg Achenbach
33,250 shares
Doug Karn
5,000 shares
Terry Karn
5,000 shares
Edward F. Robinson
1,000 shares
As a result of this merger, the Karn brothers owned more stock in Dexel than did Robinson, the company's vice president of operations. Feeling that his contribution to Dexel exceeded that of the Karn brothers, Robinson approached petitioner and Achenbach to discuss remedying this situation. As a result, Robinson was permitted to purchase 750 shares of petitioner's Dexel stock and 4,250 shares of Achenbach's stock for $ 1 per share. The $ 1 per share price was determined quite informally.↩
9. The term "audit" in this context refers to analyzing the marketing and sales information gathered by the company to determine the manner in which software and hardware systems were sold, to whom the packages were sold, why the packages were purchased, the means of payment used to purchase the packages, whether or not the software was the reason the package was purchased, and whether or not the software was subsequently put into productive use.↩
10. On August 16, 1985, Robinson also wrote a letter to Kisber indicating that Dexel had reevaluated its business plan for 1985 and 1986 and was experiencing a slowdown of business. Robinson indicated that there would be a decrease in Dexel's projected sales volume of IBM units. While Robinson testified that this letter was sent to Kisber to inform him that Dexel would not be able to meet the volume requirements of the special bid that it had previously requested from IBM, that special bid had already been withdrawn by petitioner's letter the month before. However, it is clear that Dexel was carefully documenting its efforts to meet IBM's demands and informing Jacore that it would not be engaging in high volume sales of IBM hardware.↩
11. Petitioner testified that the private meeting related to how to return to the status quo if the transaction did not work, i.e., how Jacobson could get back a substantial portion of his money and how he (petitioner) could get back his stock. The Court did not believe this testimony. There was never any suggestion that Jacobson (or Jacore) would get back any substantial amount of the $ 1 million payment, just an agreement that petitioner could get back his stock for a nominal payment.↩
12. Capital gains was the predicate on which petitioner set his price. Radigan recalled petitioner's agreeing to lower his price to $ 1 million if he could receive capital gains treatment. Radigan could not recall who assured petitioner that he would receive capital gains. He recalled that there was a consensus among the participants in the meeting that petitioner would be able to receive capital gains treatment. Radigan testified that, since he is not a tax lawyer, he was sure that he had not directly advised petitioner that such treatment was assured; he recalled that he probably said that "it looks like capital gains" to him. Radigan, of course, was at that time unaware of the Repurchase Agreement.↩
13. Petitioner testified that he and Jacobson did not want to appear as though they were not totally committed to carrying forward with the transaction. However, Jacobson regarded it as a "given" that petitioner would repurchase his stock. The Court found Jacobson's testimony more credible than petitioner's.↩
14. On July 17, 1985, petitioner and Achenbach signed a unanimous consent in lieu of a board of directors meeting declining to exercise Dexel's right of first refusal to purchase 50,000 shares of petitioner's Dexel stock. On July 19, 1985, petitioner and Achenbach also entered into an agreement to vote both as stockholders and directors of Dexel to expand Dexel's board of directors to six members, three of whom were to be designated by Jacore. On July 22, 1985, Robinson signed a unanimous consent memorializing his agreement with petitioner and Achenbach that Dexel would decline to exercise its right of first refusal to purchase 50,000 shares of petitioner's Dexel stock.↩
15. Petitioner and Robinson testified that they considered Jacore as actively managing Dexel. The Court is not persuaded that was the case. Petitioner offered copies of correspondence that he had sent to Jacobson on August 19, 1985, informing him of the purchase of a car by Dexel from a former employee. He also sent a letter seeking Jacobson's advice concerning Dexel's VAR Agreement scheduled to expire in October. There were no responses to this correspondence. Jacobson did not recall any procedures at Dexel being established to inform him of Dexel's daily business matters. Jacobson did not regard himself or Jacore as being involved with the management or day-to-day operations of Dexel.↩
16. On August 28, 1985, Jacobson, representing Jacore, attended a Dexel stockholders' meeting. During that meeting the stockholders elected a new Dexel board of directors. On that date, the new board held a meeting at which petitioner explained to the board that he was developing and would implement a bonus compensation plan to cover the final 4 months of 1985. In March of 1986, $ 300,000 in bonuses were distributed to Dexel officers. Petitioner received $ 165,000, Achenbach received $ 87,000, Robinson $ 18,000, Terry Karn $ 15,000, and Doug Karn $ 15,000. The officers in turn loaned the money back to Dexel and received installment notes evidencing their status as creditors of Dexel, in part because of cash flow problems, but in part in order to convert some of their equity interest into the status of secured debt. Jacobson was not aware that Dexel had paid some $ 300,000 in bonuses to Dexel officers in March 1986.↩
17. The Court simply did not believe petitioner's testimony or his written statements to that effect. Both Dexel and Jacore had the same problems with IBM. Jacore ceased selling IBM computers after the final 540 units; Dexel, on the other hand, decided to remain "all Blue" and comply with IBM's new requirements and guidelines. It strains credulity to suggest that Dexel could somehow supply IBM systems to Jacore and achieve indirectly what it and Jacore could not do directly. The Court is aware of the large amount of contemporaneous documentation prepared by petitioner. However, the Court has concluded that petitioner was simply creating a paper trail to try to make the transaction appear to be a bona fide sale of his stock. See supra↩ note 15. The Court is satisfied that he and Jacobson both knew that he would get his stock back the next year at a nominal price. The Court found the testimony of Jacobson and Wadsworth more credible than that of petitioner.
18. Petitioner testified they discussed the negative financial situations of Jacore and Dexel. However, Jacore, having sold the 540 IBM units, was in excellent financial condition in 1986. Petitioner testified that Jacobson suggested that petitioner repurchase his Dexel stock from Jacore. Jacobson did not recall the events that way, but always regarded it as a "given" that petitioner always intended to get his stock back. Petitioner testified they reviewed the Repurchase Agreement, its terms, and what Dexel's book value might be, but he did not recall reaching an agreement with Jacobson during that conversation that he would in fact repurchase the stock. Jacobson did not recall having any discussions with petitioner regarding the repurchase of Dexel stock during that period. Stephen Hafer, Jacore's vice president of finance and chief financial officer, had informed him that petitioner wanted to repurchase his Dexel stock.↩
19. Article 2 of the Stock Purchase Agreement states: 2. Price↩. The price to be paid for the stock shall be book value of the stock as of December 31, 1985, established after distribution of all 1985 earnings which were agreed to be distributed or paid out in accordance with the prior agreement of Purchaser [petitioner] and Seller [Jacore]. The parties agree that the book value was nominal at the beginning of 1985 and therefore it is acknowledged that the book value of the Dexel Stock hereby purchased by Jones shall not exceed $ 50,000. Book value will be established at a later date and payment will be made at that time, such value to be established in accordance with the financial statements of Dexel which were developed in accordance with generally accepted accounting principles consistently applied with prior years.
20. Article 3 of the Stock Purchase Agreement states: 3. Payment↩. The purchase price shall be paid at the time the book value of the Dexel Stock is established. To pay for the Dexel Stock, Seller, at its option, shall have the right of offset against any remaining payments owned to Jones for the original purchase price of the Dexel Stock. At the time of payment, the share certificate for the Dexel Stock shall be delivered to Purchaser, and the Stock Pledge Agreement of July 19, 1985, shall be terminated. Seller shall endorse the said stock certificate in blank and Jones shall take the necessary steps to effect delivery of a new certificate to him.
21. Apparently, the company was in poor financial condition during the first half of the year, which required the borrowing of money. In order to avoid a cash flow crisis, the board members voted unanimously to cause the officers of the company to pursue the obtaining of a financial cash reserve in the form of a bank line of credit. The company's bank refused to make a loan without the signature of Jacore, the majority stockholder of record. Jacore refused to sign necessary documents for Dexel to obtain additional bank loans. Jacobson stated that Jacore "had no intent on doing anything with Dexel and Sovran. It would be foolish for us to get in that kind of give and take." In his December 12, 1985, letter to Jacobson, petitioner had stated that Dexel's corporate bank, Sovran, would not extend any further credit without the signature of Dexel's majority stockholder, Jacore.↩
22. After the July 19, 1985, transaction, Dexel's board of directors was expanded to 10. On August 28, 1985, the stockholders of Dexel held a meeting in which they unanimously elected themselves (petitioner, Achenbach, Robinson, Doug Karn, and Terry Karn) to the board as well as Wadsworth, Jacobson, Hafer, Dom Carpentieri, and Jerry Leverette. Dexel's bylaws were amended to accommodate the increased number of directors. The stockholders at the meeting were petitioner, Achenbach, the Karn brothers, Robinson, and Jacobson representing Jacore. Hafer, Carpentieri, and Leverette never attended, or were advised of actions taken at, Dexel board meetings. The only board minutes signed by Hafer and Carpentieri were signed after their resignations from the board had been accepted. Wadsworth never attended a board meeting in person but was present by conference call on occasion or was advised later of actions taken at the meetings. He signed the minutes of two meetings prior to his resignation and one set of minutes after his resignation had been accepted. Jacobson attended one board meeting in August of 1985 shortly after the transaction at issue. He did not recall being advised of any other meetings during the period that Jacore held Dexel stock. He signed two sets of minutes before, and one set after, his resignation from the board was accepted.↩
23. Lieberman testified that he received a note from petitioner on June 4, 1986, asking him to review the Stock Purchase Agreement. Lieberman stated that the copy he received was not signed by petitioner. On July 8, 1986, Lieberman prepared an opinion letter regarding petitioner's repurchase of his Dexel stock. His opinion was based upon the original Purchase Agreement, the Stock Purchase Agreement, oral information provided by petitioner, and various court cases that he had researched. Lieberman stated that he did not speak with anyone except petitioner about the transaction and did not attempt to independently verify petitioner's statements regarding the transaction. Although Lieberman knew of the existence of the Repurchase Agreement, he had not seen the agreement until approximately 3 weeks prior to trial. He had requested a copy of the Repurchase Agreement but did not receive it prior to rendering his opinion. Lieberman's opinion is based upon the assumed bona fides of the original stock sale, which is the issue before the Court in this case.↩
24. Sec. 316 defines a dividend as any distribution of property made by a corporation to its shareholders to the extent of the corporation's earnings and profits. A constructive dividend exists when "a corporation confers an economic benefit on a stockholder without expectation of repayment." Williams v. Commissioner, 627 F.2d 1032, 1034 (10th Cir. 1980), affg. T.C. Memo. 1978-306↩.
25. The crucial facts of this case were vigorously controverted; the testimony of the key witnesses was sharply conflicting. As the fact finder, we have had to resolve credibility issues. The long and the short of it is we did not find petitioner to be a credible witness. We found the testimony of Wadsworth and Jacobson to be more credible. On brief petitioner argues that Wadsworth perjured himself. We disagree. Petitioner bases that serious charge on the recitation in certain C & S bank records as to the alleged business reasons for the alleged stock purchase by Jacore. Those C & S records were prepared by bank officials, not by Jacobson or Wadsworth. Moreover, whatever statements may have been made by Jacobson or Wadsworth to the bank officials to obtain that loan have no bearing on this Court's observation of the witnesses and opportunity to judge their credibility in this Court. Petitioner and Jacobson did not even tell their own attorneys about their secret stock Repurchase Agreement, so less than complete candor with bank loan officers is hardly astonishing.↩